## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN BARON and JOEL MILLET,<br><br>Plaintiffs,<br><br>v.<br><br>iFIT HEALTH AND FITNESS, INC., a Delaware Corporation,<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs John Baron and Joel Millet ("Plaintiff") individually and on behalf of all those similarly situated, by and through their attorneys, bring this action against Defendant iFIT Health & Fitness Inc., ("iFIT" or "Defendant") and allege as follows:

## INTRODUCTION

1.     This action arises from Defendant's sale of iFIT branded fitness equipment that offers users streamed workouts, which are plagued by severe performance and connectivity issues that cause disruption in the streaming of workouts to the equipment.

2.     Specifically, Defendant is a long-time purveyor of at-home fitness equipment— such as treadmills, stationary bikes, elliptical machines, rowers and other strength training equipment—sold under the NordicTrack, ProForm, Freemotion, and Matrix brand names.

3.     In 2007, prior to changing its corporate name, Defendant debuted what it referred to as iFIT, a workout tracker and content system connected to both tablets and iFIT-enabled equipment.

4.     In the ensuing years, iFIT morphed into a health and fitness application and streaming platform that offers a wide variety of classes that can be streamed to the video screen

equipped in an iFIT-enabled fitness device, or a phone or tablet, to deliver a gym-caliber experience to users in the comfort of their own homes.[1]

## *3 ways to use iFIT*

  

**Use our equipment**          **Use your equipment**          **Just use our app**

5.      Defendant describes the iFIT service as a "common operating system [that] connects [iFIT's] content to [its] hardware and makes it one interactive platform. It lets [iFIT's] trainers remotely control iFIT equipment in real time to adjust conditions like speed, incline, resistance and digital weight during livestreamed classes. The result is an interactive, touchless workout experience nobody else can deliver."[2]

6.      Defendant grew iFIT into a content provider in order to gain market share in the at-home fitness market currently dominated by companies like Peloton, which offer not only top-of-the-line equipment, but also proprietary fitness classes streamed directly to screens embedded in the equipment itself.

7.      Accordingly, Defendant now sells proprietary iFIT enabled fitness equipment ("Class Devices"), the key sales proposition for which is the on-demand availability of iFIT fitness classes.

---

[1] *Connected Fitness,* iFIT, https://www.iFIT.com/connected-fitness
[2] *Our* Story, iFIT, https://company.ifit.com/en/our-story/

8.      Because of the additional capabilities, described above, that iFIT enabled fitness equipment has over the competition, iFIT sells the equipment at a premium. For the same reason, iFIT capabilities are an integral and inseparable part of the Class Devices sold by iFIT.

9.      The ability to stream iFIT classes is the sole material distinguishing feature of Class Devices, and the sole reason for the price premium paid for the Class Devices when compared to similar fitness devices which are sold without iFIT.

10.     In other words, an iFIT enabled stationary bike is sold at a premium when compared to a stationary bike without iFIT solely because the user of the iFIT bike is willing to pay a premium for the capability to stream iFIT classes.

11.     Unfortunately, it is only after buying the equipment and paying for the iFIT service that consumers discover the equipment they purchased at a substantial premium over traditional offerings suffers from connectivity and streaming issues that effectively render the equipment useless.

12.     Consumers report that iFIT-enabled fitness equipment will spontaneously cease streaming (or repeatedly freeze) while the equipment is in use, often notifying users that the video should resume in 5 seconds, only to fail to do so (the "Defect").

13.     Defendant has yet to cure the Defect, and instead suggests to customers a series of half-measures that (at best) alleviate the symptoms of the Defect only temporarily while failing to actually cure it.

14.     For example, Defendant typically asserts that its equipment is working correctly and suggests that users instead (1) shut down and restart their equipment; (2) move a wireless router immediately next to the machine; (3) ask other members of the household to cease using the internet; (4) purchase a dual band router; (5) use a cell phone as a hotspot; or (6) purchase a mesh

network and place a mesh node right next to the machine. None of these purported "solutions" work consistently, however, nor do they allow consumers to use their equipment as expected and intended.

15.     Consumers are unaware of the connectivity and wireless issues that plague iFIT equipment prior to purchase. Only once they begin to stream iFIT content do they learn they cannot consistently utilize the fitness equipment they purchased at a premium price.

16.     Accordingly, Plaintiffs on behalf of themselves and all others similarly situated, bring this action to redress Defendant's violations of the Magnuson Moss Warranty Act, Florida Deceptive Unfair Trade Practices Act ("FDUTPA," Fla. Stat. §§ 501.201, *et seq*.), and New York General Business Law ("NYGBL," N.Y. Gen. Bus. Law § 349), and also seek recovery for Defendant's breach of express warranty, breach of various implied warranties, unjust enrichment, negligent misrepresentation, and fraudulent concealment.

## PARTIES

### A.     Plaintiff John Barron

17.     Plaintiff John Baron resides in Tampa, Florida.

18.     In or about June 2022, Plaintiff Barron purchased a NordicTrack S22i Studio Bike[3], which is the stationary bike depicted below, equipped with a screen for streaming workouts through iFIT's streaming service:

---

[3] https://www.nordictrack.com/exercise-bikes/s22i-studio-bike



19.    The streaming functionality and iFIT's streamed workouts were the main reason why Plaintiff Barron purchased the NordicTrack s22i stationary bike.

20.    Plaintiff Barron purchased the NordicTrack s22i Studio Bike from Facebook marketplace for roughly $850. Prior to doing so, Plaintiff Barron visited iFIT's and/or NordicTrack's website to research their lineup of screen-equipped stationary bikes enabled with iFIT's workout streaming capabilities. NordicTrack's webpage for the s22i Studio Bike advertises to consumers that the bike will allow them to stream iFIT workouts, such the advertisements below depicted on the webpage right beneath the photos of the s22i Studio Bike:



21.    NordicTrack's website further advertises to consumers that iFIT's streamed workouts will automatically adjust the resistance, incline, and decline of the s22i Studio Bike:

# Training That Moves With You

No confusing manual adjustments required. With iFIT, your trainer will automatically adjust resistance, incline, and decline for you. Just start pedaling and we'll take it from there.

22.     Nowhere on the s22i Studio Bike's page or any other iFIT webpage did Defendant disclose the Defect to Plaintiff Barron.

23.     Almost immediately after purchasing the s22i Studio Bike, Plaintiff Barron began to experience streaming connectivity issues. Specifically, over the course of Plaintiff Barron's ownership of the s22i Studio Bike, he has experienced total video failure during roughly 75-80% of his workouts. In the 20-25% of workouts that do not fail altogether, Plaintiff Barron experiences audio and/or video lag, buffering, and poor picture quality.

24.     Plaintiff Barron contacted NordicTrack support twice for this issue, first on or about July 5, 2022, and again in early August 2022. Each time, NordicTrack support conducted a full reset of Plaintiff Barron's bike and had him fully reset the bike, neither of which cured the Defect. Plaintiff Barron instead continued to regularly experience total video failure during his workouts.

25.     NordicTrack support blamed the streaming issues encountered by Plaintiff Barron on his internet connection, but Plaintiff Barron has 1GB internet speed in his home and purchased an Eros mesh WiFi system to ensure his entire house has optimal internet speed, but it has not cured the Defect, or even improved the streaming issues he has experienced. No other WiFi enabled devices in Plaintiff Barron's home have internet connectivity issues, including devices located in the same room and/or nearby his s22i Studio Bike.

26.     As a result of Defendant's inability to cure the Defect, Plaintiff Barron has been deprived of the benefit of the parties' bargain. Further, had Defendant refrained from the misrepresentations and omissions described herein, Plaintiff Barron would not have purchased his workout equipment or would have paid less for it.

**B.      Plaintiff Joel Millett**

27.     Plaintiff Joel Millett currently resides in Wilmington, North Carolina.

28.     In August 2019, while he was living in Horseheads, New York, Plaintiff Millett purchased a NordicTrack S22i Studio Bike[4], which is the stationary bike depicted below, equipped with a screen for streaming workouts through iFIT's streaming service:



29.     The streaming functionality and iFIT's streamed workouts were the main reason why Plaintiff Millett purchased the NordicTrack s22i stationary bike.

30.     Plaintiff Millett purchased the NordicTrack s22i Studio Bike new from Amazon for roughly $1999 plus tax. Prior to doing so, Plaintiff Millett visited iFIT's and/or NordicTrack's website to research their lineup of screen-equipped stationary bikes enabled with iFIT's workout streaming capabilities. NordicTrack's webpage for the s22i Studio Bike advertises to consumers

---

[4] https://www.nordictrack.com/exercise-bikes/s22i-studio-bike

that the bike will allow them to stream iFIT workouts, such the advertisements below depicted on the webpage right beneath the photos of the s22i Studio Bike:



31.     NordicTrack's website further advertises to consumers that iFIT's streamed workouts will automatically adjust the resistance, incline, and decline of the s22i Studio Bike:

# Training That Moves With You

No confusing manual adjustments required. With iFIT, your trainer will automatically adjust resistance, incline, and decline for you. Just start pedaling and we'll take it from there.

32.     Nowhere on the s22i Studio Bike's page or any other iFIT webpage did Defendant disclose the Defect to Plaintiff Millett.

33.     Roughly 6-8 months after purchasing the s22i Studio Bike, Plaintiff Millett began to experience streaming connectivity issues. Specifically, over the course of Plaintiff Millett's ownership of the s22i Studio Bike, a substantial percentage of his workouts have resulted in the workout dropping and the bike having to reboot and/or total video failure. Furthermore, even when

workouts do not fail altogether, Plaintiff Millett experiences audio and/or video lag, buffering, and poor picture quality.

34.     Plaintiff Millett contacted NordicTrack support for this issue. NordicTrack support had Plaintiff Millett download an app on his phone in order to assess his WiFi signal strength, which Defendant determined was sufficient. It made no other effort to cure the Defect, the symptoms of which he continues to experience.

35.     As a result of Defendant's inability to cure the Defect, Plaintiff Millett has been deprived of the benefit of the parties' bargain. Further, had Defendant refrained from the misrepresentations and omissions described herein, Plaintiff Millett would not have purchased his workout equipment or would have paid less for it. Nonetheless, NordicTrack support blamed the issue on his WiFi connection. But Plaintiff Millett knows that his WiFi connection is not the source of the malfunction because he has used multiple other WiFi enabled devices in the vicinity of his bike, none of which have had WiFi connectivity problems. Furthermore, Plaintiff Millett has fiber optic WiFi connection to his house which provides particularly high WiFi speeds, and his s22i bike is located only 20 feet from his internet router, but he continues to experience the connectivity issues.

**C.     Defendant**

36.     Defendant iFIT Health and Fitness Incorporated is a Delaware corporation headquartered at 1500 South 1000 West Logan, Utah 84321. iFIT and its subsidiaries own or have the rights to various trademarks, trade names, service marks and copyrights, including the following brands: iFIT®, NordicTrack®, ProForm®, Freemotion®, Weider®, Weslo®, 29029® and Sweat®, which are its principal brands, as well as iFIT ActivePulse™, iFIT Mind™, LiveAdjust™,

SmartAdjust™, SpaceSaver™, FreeStride™, Vue™, Vault™ and various logos used in association with these terms.[5]

37.    At all times relevant to this action, Defendant, its subsidiaries, and/or its agents manufactured, distributed, sold, and warranted the Class Devices throughout the United States, including the owner's manuals, warranty documents, advertisements, and other promotional materials pertaining thereto.

## JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (i) there are 100 or more Class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

39.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

40.    This Court has personal jurisdiction over Defendant because it is incorporated in this judicial district, has conducted substantial business in this judicial district, and intentionally and purposefully placed its fitness equipment into the stream of commerce within Delaware and throughout the United States.

41.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant is incorporated in this district, advertises in this district, and has received substantial

---

[5] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited October 4, 2022).

revenue and profits from its sales of iFIT equipment in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this district.

## FACTUAL ALLEGATIONS

**A.  iFIT Emphasizes its Workout Streaming Service in its Advertisements to Consumers**

42.     Defendant describes itself as "a health and fitness subscription technology company, fueled by our passion to innovate, grow and provide meaningful solutions for our members," and touts that it has "over 6.4 million Total Members and more than 1.5 million Total Fitness Subscribers with members in over 120 countries."[6]

43.     Defendant advertises iFIT as "Interactive fitness reimagined" that allows customers to "bring home live events, on-demand Global Workouts and Studio Classes."[7]

44.     Defendant's public-facing statements consistently emphasize that its products are designed to "connect" consumers with interactive workouts through its screen-enabled fitness equipment and streamed workout classes:

> We are a health and fitness subscription technology company …. iFIT is an integrated health and fitness platform, **designed to connect our proprietary software, experiential content and interactive hardware** to deliver an unmatched **connected fitness experience** …. We deliver our patented interactive experiences on the industry's broadest range of fitness modalities including treadmills, bikes, ellipticals, rowers, climbers, strength equipment, fitness mirrors, yoga equipment and accessories.

45.     Indeed, Defendant describes the Class Devices as "interactive fitness products" and "connected fitness products" with "iFIT Subscriptions" enabled with the 'iFIT operating system" that "provides interactive experiences on all of [Defendant's] connected equipment brands, allowing members to gain access to [Defendant's] full library of iFIT live and on-demand

---

[6] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited October 4, 2022).

[7] *Banner Advertising,* https://www.iFIT.com (last visited on August 18, 2022)

content."[8] Thus, Defendant considers its fitness equipment and streamed workouts as combining to form one product: "We believe the combination of our proprietary software and experiential content connected with our interactive hardware creates a compelling value proposition for our rapidly growing member base …."[9]

46. Defendant's advertisements are centered around its streaming service and emphasize that its service allows owners of iFIT equipment to stream exercise classes through iFIT's equipment:

> Providing a unique, two-way user experience that keeps our growing community of over 6.4+ million members engaged is the motivation behind iFIT's proprietary software. Our common operating system connects our content to our hardware and makes it one interactive platform. It lets our trainers remotely control iFIT equipment in real time to adjust conditions like speed, incline, resistance and digital weight during livestreamed classes. The result is an interactive, touchless workout experience nobody else can deliver.[10]

47. The streaming capabilities of Class Devices thus are critical to Defendant's marketing strategy and ability to compete in the at-home fitness market, which companies like Peloton have disrupted. For example, Defendant asserts that Class Devices provide "Endless Training Possibilities[,]" and claims consumers will "[s]ay goodbye to workout monotony with a variety of workout experiences. From studio sessions to global workouts and even cross-training options like yoga and strength conditioning, our world-class trainers provide limitless variety."[11]

48. Defendant similarly advertises the NordicTrack Rower enabled with iFIT as a combination that permits "Interactive Training Sessions[,]" and by touting its "constantly growing

---

[8] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906
0ds1a.htm (last visited October 4, 2022).
[9] *Id.*
[10] *Our Story*, iFIT, https://company.iFIT.com/en/our-story/ (last visited on August 12, 2022).
[11] *Id.*

library of global iFIT workouts feature AutoAdjust, allowing your compatible rower to adjust your

resistance automatically based on trainer cues."[12]

49.     To market its workout streaming service, Defendant claims that the service is

backed by "proprietary software":

> Our innovative iFIT software is the common operating system that unites our
> experiential content and interactive hardware into one integrated platform. Our
> software is the connective tissue that provides members with a unique two-
> way experience with iFIT's authentic trainers. Through iFIT's patented software,
> biometric data is monitored and workout variables including speed, incline,
> resistance and digital weight are dynamically adjusted in real time. Our interactive
> software optimizes our members' workout experience by removing the guesswork
> and providing personalized training. We further personalize workouts with our
> patent-pending     SmartAdjust[TM] and     ActivePulse[TM] technologies,     which
> automatically adjust our equipment based on members' real-time fitness levels and
> heart rates. Our distinctive leaderboard allows members to connect and interact
> with a global community of like-minded people.
>
> We strive to create the most compelling interactive content in the health and fitness
> industry. Our highly differentiated content seamlessly integrates with our
> proprietary software and interactive hardware, delivering a unique media form that
> we call "experiential content." Our members enjoy patented live interactive studio
> and outdoor workouts. Further, our members can access iconic fitness experiences
> with workouts filmed in more than 50 countries across seven continents. Our
> experiential content creates multi-sensory experiences that allow our members to
> see, hear and feel interactive workouts. Our content is developed and led by a team
> of over 180 world-class trainers in more than 60 categories including running,
> cycling, high-intensity interval training (HIIT), strength, boot camp and yoga, as
> well as new categories including mindfulness, nutrition and active recovery. Our
> recent acquisition of Sweat also gives our members access to additional
> differentiated content with over 5,000 unique workouts led by instructors who are
> globally recognized as top female fitness icons.[13]

50.     Defendant touts the number of subscribers of its streaming services: "During fiscal

2021, we (including Sweat) streamed 142 million live and on-demand interactive workouts across

---

[12] *Rowing Machines*, NordicTrack, https://www.nordictrack.com/rowing-machines (last visited
          on August 12, 2022).
[13] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906
0ds1a.htm (last visited October 4, 2022).

our fitness products …. In fiscal 2021, our iFIT members participated in 112 million workouts, reflecting growth of 229% year over year."[14]

51.    Defendant markets and sells iFIT-equipped fitness equipment to consumers through the following iFIT-owned brands: NordicTrack, ProForm, Freemotion, Weider, and Sweat.

52.    Below is a breakdown of the percentage of Defendant's total revenue generated by each of the foregoing brands and streaming subscriptions:



FY2021 REVENUE BY BRAND

ProForm 27%
Freemotion 1%
iFIT Subscriptions 13%
Weider 6%
NordicTrack 53%

53.    iFIT touts that it "intentionally" offers a broad array of streaming-enabled, screen-bearing equipment across a wide range of price points in order to attract the largest possible customer base:

> We generate recurring subscription revenue on the industry's broadest range of **connected fitness hardware**, including treadmills, bikes, ellipticals, rowers, climbers, strength equipment, fitness mirrors, yoga equipment and accessories. **Our interactive hardware is intelligent—specifically designed and engineered to respond to our proprietary software and experiential content**. This unique combination allows our members to have an immersive experience that can only be found on our hardware.[15]

---

[14] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited October 4, 2022).

[15] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited October 4, 2022).

54.     iFIT advertises the following iFIT-equipped <u>NordicTrack</u>[16] equipment as capable of providing streamed workouts[17]:

| Treadmills[18] | Bikes[19] | Ellipticals[20] | Strength[21] | Rowers[22] |
|---|---|---|---|---|
| Commercial 1750 | S27i Studio Bike | FS14i | Fusion CST Studio | RW900 |
| Commercial 2450 | S22i Studio Bike | FS10i | Fusion CST | RW700 |
| Elite Treadmill | FREE S15i Bike | Commercial 14.9 | Vault: Complete | RW600 |
| Commercial X22i | Commercial R35 | FREE Commercial 9.9 | Vault: Standalone | |
| Commercial X32i | Commercial VR25 | Studio Elliptical | iSelect Voice-Controlled Dumbbells | |
| EXP 14i | Commercial VU 29 | SpaceSaver SE9i | | |
| EXP 10i | Commercial VU 19 | SpaceSaver SE7i | | |
| EXP 7i | | | | |
| Elite 1000 | | | | |
| FREE C 1100i | | | | |
| Elite 900 | | | | |

iFIT advertises the following iFIT-equipped <u>Pro-Form</u>[23] equipment as capable of providing streamed workouts:

| Treadmills[24] | Bikes[25] | Ellipticals[26] | Rowers | Strength |
|---|---|---|---|---|
| Pro 9000 | Studio Bike Pro 22 | Pro HIIT H14 | Pro 750R Rower | Vue |
| Pro 2000 | Carbon CX | Pro HIIT H14 (Prev. Model) | Pro R10 Rower | |
| Carbon T14 | Studio Bike Pro | Carbot HIIT H7 | 440R Rower | |
| Carbon T10 | Pro C10R | Carbon EL | | |
| Carbon T7 | Pro C10U | Carbon E10 | | |
| City L6 | Hybrid Trainer XT | Hybrid Trainer XT | | |
| Trainer 9.0 | Studio Bike Limited | Carbon HIIT H10 | | |
| Trainer 8.0 | TDF CSC | | | |
| | 500 SPX | | | |

---

[16] https://www.nordictrack.com/
[17] https://www.nordictrack.com/
[18] https://www.nordictrack.com/treadmills
[19] https://www.nordictrack.com/exercise-bikes
[20] https://www.nordictrack.com/ellipticals
[21] https://www.nordictrack.com/strength-training
[22] https://www.nordictrack.com/rowing-machines
[23] https://www.proform.com/
[24] https://www.proform.com/treadmills
[25] https://www.proform.com/exercise-bikes
[26] https://www.proform.com/ellipticals

iFIT advertises the following iFIT-equipped <u>Freemotion</u>[27] equipment as capable of providing streamed workouts:

| Treadmills[28] | Bikes[29] | Ellipticals[30] |
|---|---|---|
| I22.9 Incline Trainer | Coachbike | E10.9b Total Body Elliptical |
| I10.9b Incline Trainer | U22.9 Upright Bike | E8.9b Total Body Elliptical |
| T22.9 Reflex | R22.9 recumbent Bike | |
| T10.9 Interval Reflex | R10.9b Recumbent Bike | |
| T10.9b Reflex | U10.9b Upright Bike | |
| T8.9b | U8.9b Upright Bike | |
| | R8.9b Recumbent Bike | |

iFIT advertises the following iFIT-equipped <u>Matrix</u>[31] equipment as capable of providing streamed workouts:

| Treadmills[32] | Bikes[33] | Ellipticals[34] |
|---|---|---|
| TF30 | R30 | E30 |
| TF50 | R50 | E50 |
| T30 | U30 | A30 |
| T50 | U50 | A50 |
| T75 | ICR50 | |
| Climbmill C50 | | |

55.     Each of the foregoing models of iFIT fitness equipment are equipped with a screen for streaming workouts directly to the piece of equipment. Based upon widespread consumer complaints reporting streaming disruption in various types of iFIT equipment, Plaintiffs allege

---

[27] https://freemotionfitness.com/

[28] https://freemotionfitness.com/machines-for-home-gym/incline-trainer/; https://freemotionfitness.com/machines-for-home-gym/treadmills/

[29] https://freemotionfitness.com/machines-for-home-gym/indoor-bikes/

[30] https://freemotionfitness.com/machines-for-home-gym/ellipticals/

[31] https://matrixhomefitness.com/

[32] https://matrixhomefitness.com/collections/treadmills; https://matrixhomefitness.com/collections/climbmills

[33] https://matrixhomefitness.com/collections/bikes

[34] https://matrixhomefitness.com/collections/ellipticals

upon information and belief that all of the foregoing models of screen-bearing iFIT equipment suffer from the Defect.

56.     As evidenced by its advertisements, Defendant is aware that consumers purchase iFIT equipment—and pay a premium for it—due to its purported streaming capabilities. Absent these performance properties, iFIT equipment is nothing more than outdated fitness equipment sold at inflated prices. The same is true of any of Defendant's iFIT-enabled product offerings.

## B.  The Connectivity Issue

57.     Defendant publicly touts that its exercise streaming service is engineered to function seamlessly:

> We design and develop our own software, content, and hardware to ensure these elements work in harmony across our portfolio of brands and products …. Our content is delivered by our patented streaming technology that connects our wide range of connected devices. This comprehensive technology stack allows our devices to seamlessly connect to our network of products and members. This network effect of interactive fitness devices drives high engagement, retention, and social interaction. We believe our member-centric platform is difficult to replicate and highly scalable into adjacent categories and verticals ….

> We are constantly improving and expanding our members' experience, which ensures high subscriber engagement, retention and satisfaction. We will continue to enhance our members' experience by developing new content, deploying new software and continually personalizing the ways our members engage with iFIT. Whether consumers are at home, outside or in commercial facilities, iFIT will provide experiential content on our expanding platform of interactive equipment, mobile apps and digital TV apps. [35]

58.     As noted above and reflected in the many consumer complaints reproduced below, Class Devices suffer from a Defect that results in streaming disruption due to, *inter alia*, buffering, freezing, poor audio/visual quality, and/or total video failure. The Defect effectively renders inoperable Class Devices, depriving Plaintiffs and the Class of the benefit of their bargain.

---

[35] *See* https://www.sec.gov/Archives/edgar/data/1850741/000119312521288661/d12906 0ds1a.htm (last visited October 4, 2022).

59.     One Facebook user commented about his interactions with Defendant deflecting blame of iFIT's poor video quality on the consumer's "WiFi":



July 4 · 🌐

So I'm having poor video with my Commercial 2950 Treadmill.  At first, iFit wouldn't even connect to my internet.  After a couple of resets, it does but the video quality on the workouts has been horrible for about 3 weeks.  My wireless is working well (1 GB connection) and even gave my treadmill priority on the home wireless.  I also tried connecting to my phone's hotspot, and I still received horrible video quality.  I called iFit support and went through the troubleshooting with them, and they ended up blaming it on my wifi, which I know is not the case, especially since I tried it on my phone.  Any help would be appreciated and thanks for setting up this group!

😢 2                                          8 Comments

60.     Another user recorded the buffering issues he experiences when he attempts to stream an iFIT workout on this NordicTrack EXP 10i, and uploaded the recording to YouTube.[36]

61.     A user who purchased a NordicTrack treadmill likewise complained they were unable to make it through a single workout without the video buffering or freezing. And contrary to Defendant's self-serving claims that video failures are the result inadequate WiFi signals, multiple users (like the one below) report that other WiFi-dependent devices located next to or near their iFIT equipment function without issue, or have otherwise confirmed their WiFi is not the cause of the streaming disruption:

---

[36] https://www.youtube.com/watch?v=9U7Ek5BTEvA&t=6s

### New to NT with commercial 2950 tread. So far iFit is terrible. Help??

We haven't been able to do a single workout without it buffering or freezing or cutting out and coming back minutes later strangely without music. We have a Google mesh wifi system with great reception where the tread is at — 1gb speed internet. We also have a peloton bike in the same room and the connection for that has never had an issue. It's not the wifi. I'm at a loss. Brand new tread basically unusable. Does anyone have suggestions to try and navigate support on this? Have already tried factory reset and ensured sw was up to date. Thanks in advance. 😠

62.    Consumers report they have taken a number of steps in an attempt to remedy the Defect, all of which failed, including the following: (1) placing their internet router directly next to their iFIT device; (2) adding a WiFi extender or a mesh networking device (like Google mesh) and then placing that next to the iFIT device; (3) stopping streaming of video streaming services like Netflix while exercising; (4) purchasing a dual band router; and, (5) using a mobile device as a hotspot instead of home internet.[37] However, these troubleshooting efforts did not work for the iFIT customer below or her daughter—and, on information and belief, countless others—who, after purchasing a Google mesh system and upgrading their internet to the fastest available to them, continued to experience video failures and were unable to save a record of their workout:[38]



Same problem here, with my Nordictrack Commercial Elliptical. I purchased a Google mesh system and upgraded our wireless to the fastest Spectrum has available. Twice this week, there was a complete cancellation of the workout - once for my daughter, and once for me. Since upgrading the wifi, and until this week, when we disconnected, the program came back and contnued where we left off. With this week's incidents, the screen blacked out before the word "cancelling" appeared in white, and the program restarted with a message that the prior workout was not saved.

---

[37] *See, e.g.*, *Status*, iFIT, https://www.iFIT.com/status/5e155350ee0d6101b3bcd4d5?sfmc_j=1456517&sfmc_s=434735000&sfmc_l=15&sfmc_jb=7961&sfmc_mid=7307943&sfmc_u=58255162&fbclid=IwAR1dbYrIOUAcI5EC3-1WGxAaHef3evwG9DmraqE13CLcmZ2IEvknaxCQK3A (last visited August 19, 2022).

[38] *Id.*

63.    Another user explained that his machine crashes and freezes, which iFIT support representatives incorrectly blamed on his WiFi:

 Feb 2, 2020

**Has never worked. Can't get it fixed or replaced.**

We have issues since day one on our machine. It crashes freezes and is a pain to use some days. Support at the beginning told us they would send new parts and a software update was coming. I mentioned at that time that if it didn't resolve the issue I wanted to return. Since then I'm told that I'm beyond the return window. They try to offer useless support and blame my internet connection. It is not. I can reproduce network issues and I do not get crashes. I get expected results, buffering and low res video. I last spent 2 hours on the phone trying to get through to somebody that could help. I got nowhere. I was told I need to go through support and I was refusing it. I wasn't refusing it. I've spent a year with it and it still doesn't work.

The iFit workouts are good. But the equipment is really poor quality. It's running on android and I think it's just cheap underpowered hardware.

Look elsewhere. Don't bother.

## C.  Defendant's Knowledge of the Defect

64.    Before Defendant placed Class Devices into the stream of commerce, it knew or should have known that Class Devices suffer from the Defect. Yet, Defendant made no effort to resolve the Defect prior to making Class Devices available for purchase.

65.    Defendant instead continued to manufacture and sell defective Class Devices, while failing to cure (or make any effort to cure) the Defect.

66.    Embedded below are exemplar online complaints to which Defendant has responded, thereby demonstrating its longstanding knowledge of the Defect.[39]

---

[39] https://www.trustpilot.com/users/62f4076ae58751001257b0e5 (last visited on August 18, 2022).



67.    Another customer made similar complaints about a NordicTrack stationary bike he

purchased in May 2021, which Defendant acknowledged by responding two days later:



05/25/2022

Please don't support this comapny! We got our nordic track bike in may of 2021. It worked fine for the first few months. Then it would cut out mid work out or even 5 minutes in, the video just stopped. We had called several times. They tried to blame it on our internet which wasn't the case. Then we did an "extensive troubleshooting" which was a simple reboot. We were told there is nothing they can do about it not working, since the bike still pedals its considered to have no issues. We have contacted and emailed numerous times with zero help. I would spend the extra money on a peloton. We are out a few grand with nothing to show. Im hoping other consumers read this before spending money to avoid the issue we faced.



**IFIT Response**

05/27/2022

****** We are very sorry for the experience you have had with your bike. It is uncommon for a bike to stop working correctly, especially after only a few months of regular use. We would like to readdress this and provide you the assistance you are needing. Please feel free to call us at: ************** or reach out to us at: iFIT.zendesk.com so we can assist you.Thanks! - iFIT

68.     Defendant's efforts to outline suggested cures for the Defect also evince its years'-long knowledge of the major connectivity issues that plague its iFIT-enabled fitness equipment. Indeed, as early as September 2020 (and on information and belief earlier) NordicTrack posted a suggested workaround for the Defect so cumbersome it required two people to carry it out[40]:

# How To Do A Factory Reset On A NordicTrack Machine

If your built-in console or the iFit Cardio app has stopped responding, or if your Wi-Fi connection is still poor after you have reset your router, a factory reset might be your solution.

---

[40] *IFIT Factory Reset*, NordicTrack, https://web.archive.org/web/20200928211312/https://www.nordictrack.com/learn/iFIT-help-factory-reset-on-machine/ (last visited August 19, 2022)

We recommend that you complete a factory reset with two people. Make sure that your Wi-Fi is turned on, and that you have a paperclip on hand.



First, locate and turn off the power to your equipment by flipping the power switch to the off position. To locate the switch on your equipment, check your owner's manual. If your machine is a NordicTrack rower, simply unplug it.

Next, locate the pinhole, which will most likely be found on one of the sides or on the back of your console. If you have difficulty finding it, please consult your owner's manual.

Insert the paper clip into the pinhole. As you insert the paper clip, press and hold it down. As you hold the paper clip, have the second person flip the power switch back on. Once the screen lights up, you may remove the

69.     Defendant, upon information and belief, through (1) its public acknowledgement of the Defect; (2) its own records of customers' complaints, (3) repair records, (4) warranty and post-warranty claims, (5) internal pre-sale testing and internal investigations, and (6) other various sources, has always known or should have known of the Defect in the Class Devices.  Yet, at no time has Defendant disclosed the Defect to consumers, or warned consumers despite knowing the Defect persists today.

70.     Defendant failed to adequately research, design, test and/or manufacture the Class Devices before warranting, advertising, promoting, marketing, and/or selling them as suitable for use in an intended and/or reasonably foreseeable manner.

71.     Defendant is experienced in the design and manufacture of consumer fitness products such as the Class Devices and, therefore, in the ordinary course of its business conducts tests, including pre-sale testing, to verify the fitness products it sells—including the Class

Devices—are free from defects and align with Defendant's advertisements, specifications, and intended use of the Class Devices.

72.     Thus, Defendant knew of the Defect and its associated manifestations and harms prior to advertising and selling Class Devices, yet made no substantive design modifications to eliminate the Defect and attendant manifestations.

**D.  Plaintiffs' and the Class' Reasonable Expectations**

73.     When purchasing Class Devices, Plaintiffs and the Class expected the equipment to operate in accordance with its intended and ordinary purpose: to stream high quality fitness classes without freezing, buffering or completely shutting down without any additional requirements or accommodations, including but not limited to having to rearrange their homes, cease use of the internet while working out, and/or purchase additional (and expensive) modems and routers to facilitate their use of Class Devices. Additionally, Class Devices were marketed as being capable of saving workout histories and statistics in order to help users meet their goals.

74.     Plaintiffs and the Class reasonably expected Defendant—and Defendant was obligated—to disclose the Defect prior to or at the time of sale due to Defendant's superior and exclusive knowledge thereof.

75.     Defendant actively concealed from, and/or failed to disclose to, Plaintiffs and the Class the true defective nature of Class Devices, and failed to remove the Class Devices from the marketplace or take adequate remedial action to cure the Defect.

76.     As a result of the Defect, Plaintiffs and the Class did not receive the benefit of their bargain, and their Class Devices fail of their ordinary and intended purpose.

77.     As a consequence of Defendant's actions and omissions, Plaintiffs and the Class have been deprived of the benefit of their bargain, lost use of the Class Devices, and incurred lost

time and costs, including repair and/or replacement costs, time spent in arranging and obtaining

repairs, and inconvenience.

**E. Defendant's Deficient Warranty Performance**

78.     Despite longstanding knowledge of the Defect as set forth above, Defendant refuses

to cure the Defect in Class Devices. Instead, Defendant commonly blames the defect on owners'

WiFi connections in order to avoid performing warranty repairs.

79.     iFIT provides essentially the same Limited Warranty for all its brands, which

promises that Class Devices are free from defects[41]:

> iFIT, Inc. warrants this product to be free from defects in workmanship and
> material, under normal use and service conditions .... If replacement parts are
> shipped while the product is under warranty, the customer will be responsible for a
> minimal handling charge. For in-home service, the customer may be responsible
> for a minimal trip charge. This warranty does not extend to freight damage to the
> product .... For warranty service, please call the telephone number on the front
> cover of your manual. Please be prepared to provide the model number and serial
> number of the product.

80.     Thus, if iFIT determines that a warranty repair is warranted and requires

replacement parts, customers are responsible for paying a handling charge. Moreover, if a repair

requires in-home service, the customer may be responsible for a trip charge.

81.     As noted above and reflected in the many consumer complaints embedded herein,

Defendant has consistently failed to meet its warranty obligations because it has failed to develop

a true "fix," instead proposing to customers stop-gap measures or home remedies that fail to cure

the Defect permanently. Defendant thus has breached its Limited Warranty.

82.     The experience of the Class members is the same. The Defect arises from defective

materials or workmanship in the iFIT devices and is therefore covered under iFIT's Limited

---

[41] https://www.nordictrack.com/warranty-terms-and-conditions

Warranty. Yet iFIT has refused to fix the Defect and instead suggests various home remedies which are not limited to the following:

    a.   placing their internet router directly next to their iFIT device;

    b.   adding a WiFi extender or a mesh networking device (like Google mesh) and then placing that next to the iFIT device;

    c.   stopping streaming of video streaming services like Netflix while exercising;

    d.   purchasing a dual band router; and,

    e.   using a mobile device as a hotspot instead of home internet.

83.    None of these home remedies or a myriad of other ones referenced in this complaint actually fix the Defect within the iFIT device or remedy the issue.

84.    As explained above, iFIT was aware, had reason to know, or was reckless in not knowing that its suggested home fixes would not cure or rectify the Defect. Moreover, iFIT was aware, had reason to know, or was reckless in not knowing that replacing one iFIT component with another identical iFIT component also would not remedy the defect.

85.    According to iFIT's Limited Warranty, even when the iFIT device is under warranty, the costs of repair are, at least partially shifted to iFIT's customers, who must pay for handling charges or trip fees. And, even worse, when all repairs fail to remedy the defect, customers are left with an iFIT device that cannot actually stream exercise programs to its users, which is the sole purpose for its purchase in the first place.

86.    Accordingly, iFIT's refusal to honor its warranty obligations renders their iFIT devices useless and deprives consumers of the benefit of their bargain.

87.    Alternatively, Defendant's refusal to honor its warranty obligations shifts the costs of the Defect onto its customer, who must pay to replace their defective iFIT fitness equipment with competitive offerings at their own expense

88.     The Defect that arises outside the warranty's limited period should nonetheless be remedied by iFIT at no cost because the warranty is procedurally and substantively unconscionable. Therefore, when the Defect arises, iFIT must be estopped from denying warranty claims on the grounds that the warranty has expired. Specifically, the Class Device warranty is procedurally unconscionable because:

    a.  Consumers did not have a meaningful opportunity to participate in creating the warranty.

    b.  iFIT is a nationally operating enterprise with a substantial market power to dictate the terms of the warranty to consumers.

    c.  iFIT created the warranty term that consumers had no choice or ability to alter.

    d.  iFIT offered the warranty to consumers on the "take-it-or-leave-it" basis.

The Class Device warranty is substantively unconscionable because:

    a.  The iFIT devices are a durable good.

    b.  It is material to a reasonable consumer that the iFIT devices will function properly without needing repair or replacement for a significant period of time

    c.  Upon information and belief, at all relevant times, iFIT has had superior knowledge regarding the Defect present in the Class Devices due to its control over the design, manufacture, and/or testing of the Class Devices

    d.  Upon information and belief, iFIT has had superior knowledge regarding the Class Devices' lack of durability as a result of consumer complaints and warranty claims as early as September 2020

    e.  Despite iFIT's superior knowledge of the existence of the Defect and the likelihood that the Defect will manifest after expiration of the applicable warranty period, iFIT consistently refuses to replace failed iFIT devices under its warranty.

    f.  Alternatively, when iFIT does replace the Class Devices, the replacement devices manifest the same defect.

89.     iFIT's warranty fails of its essential purpose because iFIT cannot cure the Defect.

90.     Due to the reasons explained above, no reasonable consumer would enter into an agreement with such terms.

91.     Accordingly, iFIT's warranty is unconscionable, and iFIT must be estopped from enforcing it against Class members.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

92.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the Defect as well as the omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Defect and could not reasonably discover the defect or Defendant's deception with respect to the Defect.

93.     At all times, Defendant was and is under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, character, nature and grade of the Class Devices and to disclose the Defect. Instead, Defendant omitted disclosure of the presence of the Defect and continues to sell Class Devices that contain the Defect, rather than repairing them prior to sale. Defendant actively concealed the true standard, quality, character, nature and grade of the Class Devices and omitted material information about the quality, reliability, characteristics and performance of the Class Devices. Plaintiffs and members of the Class reasonably relied on Defendant's knowledge and concealment of the facts alleged herein.

94.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment; further, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this action pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

**Nationwide Class:**
All persons or entities in the United States who purchased an iFIT Class Device.

**<u>Florida Subclass:</u>**
All persons or entities who purchased an iFIT Class Device in Florida.

**<u>New York Subclass</u>**:
All persons or entities who purchased an iFIT Class Device in New York.

96.    Together, the Nationwide Class and the Florida and New York  Subclasses shall be collectively referred to herein as the "Class." Excluded from the Class are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased the Class Devices for purposes of resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change or expand the Class definition after conducting discovery.

97.    <u>Numerosity</u>:  The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the possession of Defendant and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe that the Class consists of hundreds of thousands, if not millions, of persons and entities that were deceived by Defendant's conduct.

98.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of fact and law exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members.  These common factual and legal questions include, but are not limited to:

   a.   Whether Defendant engaged in the conduct alleged herein;

   b.   Whether Defendant designed, advertised, marketed, distributed, sold, or otherwise placed the Class Devices into the stream of commerce in the United States;

   c.   Whether Defendant knew about, and failed to disclose, the Defect at the time Plaintiffs and the Class members purchased their Class Devices;

   d.   Whether Defendant designed, manufactured, marketed, and distributed the Class Devices knowing that the Defect could and would occur;

e.  Whether Defendant's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

f.  Whether Defendant owed a duty to warn Plaintiffs and Class Members about the Defect;

g.  Whether Plaintiffs and the other Class members overpaid for their Class Devices;

h.  Whether Defendant breached its warranties by failing to properly inspect and repair the Defect;

i.  Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

j.  Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

99.  Typicality:  All of Plaintiffs' claims are typical of the claims of the Class since each Class Device was advertised with the same type of false and/or misleading statements, regardless of model or production year. Plaintiffs and the Class sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of herself and all absent Class Members.

100.  Adequacy:  Plaintiffs are adequate Class representatives because his interests do not materially or irreconcilably conflict with the interests of the Class that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

101.  Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would

be virtually impossible for members of the Class individually to effectively redress the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

102.    Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT,
### 15 U.S.C. § 2301, *et seq*. ("MMWA")
(on behalf of the Nationwide Class or alternatively the state Sublcasses)

103.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

104.    The MMWA provides a private right of action by purchasers of consumer products against retailers who, *inter alia*, fail to comply with the terms of an implied or written warranty. 15 U.S.C. § 2310(d)(1).  As alleged herein, Defendant has failed to comply with its implied warranty of merchantability with regard to the Class Devices.

105.    The Class Devices are consumer products, as that term is defined in 15 U.S.C. § 2301(1).

106.    Plaintiffs and each member of the Nationwide Class and Florida Class are consumers, as that term is defined in 15 U.S.C. § 2301(3).

107.    Defendant is a supplier and warrantor, as those terms are defined in 15 U.S.C. §§ 2301(4)-(5).

108.    The MMWA provides a cause of action for breach of warranty or other violations of the Act. 15 U.S.C. § 2310(d)(1).  Defendant breached the implied warranty of merchantability for the Class Devices, as alleged herein, which it cannot disclaim under the MMWA, 15 U.S.C. § 2308(a)(1), by failing to provide merchantable goods.  Plaintiffs have suffered damages as a result of Defendant's breach of the implied warranty of merchantability as set forth herein. 15 U.S.C. §§ 2310(d)(1)-(2).

109.    Defendant was provided notice of the claims raised by Plaintiffs and was afforded a reasonable opportunity to cure.  Defendant failed to cure in that it has not offered a repair to Plaintiffs and consumers for the Defect.  Until Plaintiffs' representative capacity is determined, notice and opportunity to cure through Plaintiffs, and on behalf of the Class, can be provided under 15 U.S.C. § 2310(e).

110.    Defendant's acts and omissions in violation of the MMWA are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful. 15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

111.    Plaintiffs and the members of the Classes have suffered, and are entitled to recover, damages as a result of Defendant's breach of express and/or implied warranties and violations of the MMWA.

112.    Plaintiffs also seek an award of costs and expenses, including attorneys' fees, under the MMWA to prevailing consumers in connection with the commencement and prosecution of

this action. 15 U.S.C. § 2310(d)(2).  Plaintiffs and the prospective Classes intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
(on behalf of the Nationwide Class or alternatively the state Subclasses)

113.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

114.    Defendant provided all purchasers and lessees of the Class Devices with the same express warranties described herein, which became part of the basis of the bargain.

115.    The parts affected by the Defect were distributed by Defendant in the Class Devices and are covered by the warranties Defendant provided to all purchasers and lessors of Class Devices.

116.    Defendant breached these warranties by selling Class Devices with the Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

117.    Plaintiffs notified Defendant of the breach within the warranty period, but Defendant already knew of the Defect and yet chose to conceal it and failed to comply with its warranty obligations.

118.    As a direct and proximate cause of Defendant's breach, Plaintiffs and the members of the Class bought Class Devices they otherwise would not have, overpaid for their Class Devices, did not receive the benefit of their bargain, and their Class Devices suffered a diminution in value. Plaintiffs and the Class have also incurred and will continue to incur costs related to the diagnosis and repair of the Defect.

119.    Defendant's attempt to disclaim or limit these express warranties is unconscionable and unenforceable under the circumstances here.

120.    Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the Defect.

121.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Classes.  A gross disparity in bargaining power existed between Defendant and the Class Members, and Defendant knew or should have known that the Class Devices were defective at the time of sale and would fail well before their useful lives.

122.    Plaintiffs and the Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(on behalf of the Nationwide Class or alternatively the state Subclasses)

123.    Plaintiffs incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

124.    Defendant manufactured and distributed Class Devices throughout the United States for sale to Plaintiffs and Class Members.

125.    Defendant impliedly warranted to Plaintiffs and members of the Classes that their Class Devices were free of defects and were merchantable and fit for their ordinary purpose for which such goods are used.

126.    As alleged herein, Defendant breached the implied warranty of merchantability because the Class Devices suffer from the Defect.  The Class Devices are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

127.    After Plaintiffs experienced the Defect and contacted Defendant on multiple occasions without relief, Plaintiffs gave reasonable and adequate notice to Defendant that the Class Devices were defective, unmerchantable, and unfit for their intended use or purpose.

128.    Due to the Defect, Plaintiffs and the members of the Classes are unable to operate their Class Devices as intended, substantially free from defects.  The Class Devices do not provide consistent workout streaming to Plaintiffs and Class members.  As a result, Plaintiffs and members of the Classes are unable to stream workouts to their Class Devices.

129.    Plaintiffs did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies.  Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws.  Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable.  As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and members of the Classes have been injured in an amount to be proven at trial.

## COUNT IV
## NEGLIGENT MISREPRESENTATION
(on behalf of the Nationwide Class or alternatively the state Subclasses)

130.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

131.    Defendant had a duty to provide honest and accurate information to its customers so that customers could make informed decisions on the substantial purchase of automobiles.

132.    Defendant specifically and expressly misrepresented material facts to Plaintiffs and Class members, as discussed above.

133.    Defendant knew, or in the exercise of reasonable diligence, should have known, that the ordinary and reasonable consumer would be misled by Defendant's misleading and deceptive advertisements.

134.    Plaintiffs and the Class members justifiably relied on Defendant's misrepresentations and have been damaged thereby in an amount to be determined at trial.

## COUNT V
## FRAUDULENT CONCEALMENT
(on behalf of the Nationwide Class or alternatively the state Subclasses)

135.    Plaintiffs incorporate by reference the allegations of all foregoing paragraphs as if they had been set forth in full herein.

136.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Class Devices.

137.    Defendant, acting through its representatives or agents, sold the Class Devices throughout the United States.

138.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Devices, including that they suffered from the Defect.

139.    Rather than inform consumers of the truth regarding the Defect, Defendant concealed material information related to the Defect.

140.    Defendant's omissions were material because the Defect has a substantial impact not simply on the convenience and cost of Class Device maintenance, but also on the reliability of the Class Devices over time.

141.    Defendant omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Class Devices, or would have paid substantially less for them, had they known the truth.

142.    Plaintiffs and the Class members had no way of knowing about the Defect.

143.    Plaintiffs and Class members could not have discovered the above information on their own, because Defendant was in the exclusive possession of such information.

144.    Although Defendant has a duty to ensure the accuracy of information regarding the performance of its Class Devices, it did not fulfill these duties.

145.    Plaintiffs and Class members sustained injury due to the purchase of Class Devices that suffered from the Defect.

146.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's Class Devices. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT VI**
**UNJUST ENRICHMENT**
(on behalf of the Nationwide Class or alternatively the state Subclasses)

147.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

148.    This claim is pled in the alternative to Plaintiffs' contract-based claims.

149.    Defendant knew or should have known that Plaintiffs and the class paid for the Class Devices with the expectation that they would perform as represented and were free from defects.

150.    Plaintiffs and the Class conferred substantial benefits on Defendant by purchasing the defective Class Devices. Defendant knowingly and willingly accepted and enjoyed those benefits.

151.     Defendant's retention of these benefits is inequitable.

152.     As a direct and proximate cause of Defendant's unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

**COUNT VII**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR**
**TRADE PRACTICES ACT ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq*.**
(on behalf of the Florida Class)

153.     Plaintiff Baron and the Florida Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

154.     Plaintiff Baron brings this claim on behalf of himself and on behalf of the Florida Class against Defendant.

155.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  Defendant engaged in unfair and deceptive practices that violated the FDUTPA as described above.

156.     Defendant engaged in "trade or commerce" in Florida within the meaning of the FDUTPA.  *See* Fla. Stat. § 501.203(8).

157.     Defendant caused to be made or disseminated through Florida and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including Plaintiff Baron and the other Florida Class Members and otherwise engaged in activities with a tendency or capacity to deceive.

158.     In violation of the FDUTPA, Defendant employed unfair and deceptive acts or practices, fraud, false pretense, misrepresentation, or concealment, suppression or omission of a

material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Devices.  Defendant knowingly concealed, suppressed and omitted materials facts regarding the Defect and misrepresented the standard, quality, or grade of the Class Devices, which directly caused harm to Plaintiff Baron and the Florida Class.

159.    Defendant actively suppressed the fact that that Class Devices contain the Defect because of materials, workmanship, design, and/or manufacturing defects. Further, Defendant employed unfair and deceptive trade practices by failing to provide repairs of the Defect or replacement of Class Devices due to the Defect within a reasonable time in violation of the FDUTPA. Defendant also breached its warranties as alleged above in violation of the FDUTPA.

160.    As alleged above, Defendant has known of the Defect contained in the Class Devices for years. Prior to selling the Class Devices, Defendant knew or should have known the Class Devices contained the Defect due to pre-production testing, quality control audits/investigations, and other pre-sale manufacturing/design assessments. Defendant also should have known of the Defect from the early complaints and service requests it received from Class Members and from other internal sources. Defendant nevertheless failed to disclose and actively concealed the Defect.

161.    Defendant's unfair and deceptive trade practices were likely intended to deceive a reasonable consumer. Plaintiff Baron and members of the Florida Class had no reasonable way to know that the Class Devices contained the Defect or were defective in workmanship, design, and/or manufacture. Defendant possessed superior knowledge as to the quality and characteristics of the Class Devices, including the Defect within its Class Devices, and any reasonable consumer would have relied on Defendant's misrepresentations and omissions, as Plaintiff Baron and members of the Florida Class did.

162.    Defendant intentionally and knowingly misrepresented material facts and omitted material facts regarding the Class Devices and the Defect present in Class Devices with an intent to mislead Plaintiff Baron and the Florida Class.

163.    Defendant knew or should have known that their conduct violated the FDUTPA.

164.    Defendant owed Plaintiff Baron and the Florida Class a duty to disclose the true nature, character, and reliability of the Class Devices and the existence of the Defect because Defendant:

a.  Possessed exclusive knowledge of the Defect;

b.  Intentionally concealed the foregoing from Plaintiff Baron and the Florida Class; and/or

c.  Represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

d.  Provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data, and other information to consumers regarding the performance, reliability, quality, and nature of the Class Devices;

e.  Represented that goods or services were of a particular standard, quality, or grade, when they were of another;

f.  Engaged in unconscionable commercial practices in failing to reveal material facts and information about the Class Devices, which did, or tended to, mislead Plaintiff Baron and the Florida Class Members about facts that could not reasonably be known by the consumer;

g.  Failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

h.  Caused Plaintiff Baron and the Florida Class Members to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

i.  Failed to reveal material facts to Plaintiff Baron and the Florida Class Members with the intent that Plaintiff Baron and the Florida Class Members would rely upon the omission; and

j.  Made material representations and statements of fact to Plaintiff Baron and the Florida Class Members that resulted in Plaintiff Baron and the Florida Class Members

reasonably believing the represented or suggested state of affairs to be other than what they actually were.

165.    Plaintiff Baron and the other Florida Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendant's unfair, unlawful, and/or deceptive practices. In purchasing their Class Devices, Plaintiff Baron and the other Florida Class Members relied on the misrepresentations and/or omissions of Defendant with respect to the functionality and reliability of the Class Devices. Defendant's representations were untrue because the Class Devices are distributed with the Defect that prevents seamless streaming of iFIT workouts. Had Plaintiff Baron and the other Florida Class Members known this, they would not have purchased their Class Devices and/or paid as much for them. Accordingly, Plaintiff Baron and the other Florida Class Members overpaid for their Class Devices and did not receive the benefit of their bargain.

166.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's businesses. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of Florida and nationwide.

167.    Plaintiff Baron, individually and on behalf of the other Florida Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing their unfair, unlawful, and/or deceptive practices and to provide declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**COUNT VII**
**BREACH OF EXPRESS WARRANTY**
**F.S.A. § 672.313**
(on behalf of the Florida Class)

168.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

169.    Plaintiff Baron brings this cause of action on his own behalf and on behalf of the members of the Florida Class.

170.    Defendant is and was at all relevant times a "merchant" under F.S.A. § 672.104(1).

171.    The Class Devices are and were at all relevant times "goods" within the meaning of F.S.A. § 672.105(1).

172.    Defendant provided all purchasers of the Class Devices with a warranty, which became a material part of the bargain.

173.    In the warranty, Defendant agreed to repair or replace all parts on the Class Devices that malfunction or fail during normal use.

174.    Defendant manufactured and/or installed all parts, including the streaming screens, in the Class Devices; thus, the Class Devices and their component parts are covered by Defendant's warranty.

175.    The Defect at issue in this litigation was present at the time the Class Devices were sold to Plaintiff Baron and the Florida Class Members.

176.    Plaintiff Baron and the Florida Class Members relied on Defendant's express warranty, which was a material part of the bargain, when purchasing their Class Devices.

177.    Under the express warranty, Defendant was obligated to correct the Defect in the Class Devices owned by Plaintiff Baron and the Florida Class Members.

178.    Although Defendant was obligated to correct the Defect, none of the attempted fixes are adequate under the terms of the warranty, as they did not cure the defect.

179.    Defendant breached the express warranty by performing illusory repairs. Rather than repairing the Class Devices pursuant to the express warranty, Defendant: (1) falsely informed Florida Class Members that there was no problem with their Class Devices; (2) performed

ineffective or harmful repairs; (3) replaced defective components with equally defective components; and (4) re-calibrated or replaced original factory-installed equipment in an effort to hide evidence of the Defect. Defendant did not, however, actually repair the Class Devices.

180.    Defendant has failed and refused to conform the Class Devices to the express warranty. Defendant's conduct, as alleged throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

181.    Moreover, Defendant's attempt to disclaim or limit the express warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

182.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff Baron and the Florida Class Members. Among other things, Plaintiff Baron and the Florida Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members, and Defendant knew or should have known that the Class Devices were defective at the time of sale.

183.    Plaintiff Baron and the Florida Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

184.    Plaintiff Baron and the Florida Class Members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the Defect from the complaints it received from Plaintiff Baron and the Florida Class Members, from repairs and/or

replacements of the Class Devices or components thereof, and through other internal and external sources.

185.    Because Defendant, through its conduct and exemplified by its own software updates and troubleshooting suggestions, has attempted to repair the Defect under warranty, Defendant cannot now deny that the warranty covers the Defect.

186.    Because Defendant has not been able to remedy the Defect, any limitation on remedies included in the warranty causes the warranty to fail its essential purpose, rendering such limitation null and void.

187.    As a direct and proximate cause of Defendant's breach, Plaintiff Baron and the Florida Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale. Additionally, Plaintiff Baron and the Florida Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

188.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiff Baron and the Florida Class Members have been damaged in an amount to be determined at trial.

**COUNT VIII**
**BREACH OF IMPLIED WARRANTY**
**F.S.A. § 672.314**
(on behalf of the Florida Class)

189.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

190.    Defendant is and was at all relevant times a "merchant" under F.S.A. § 672.104(1).

191.    The Class Devices are and were at all relevant times "goods" within the meaning of F.S.A. § 672.105(1).

192.    A warranty that the Class Devices were in merchantable condition and fit for the ordinary purpose for which Class Devices are used is implied by law under F.S.A. § 672.314.

193.    Defendant knew or had reason to know of the specific use for which the Class Devices were purchased. Defendant directly sold and marketed Class Devices to customers from its various websites and/or through authorized dealers, for the intended purpose of consumers purchasing the Class Devices. To the extent Class Devices were sold to Florida Class Members directly through its various websites or through authorized dealers, Defendant knew that the Class Devices would and did pass unchanged from the authorized dealers to Florida Class Members, with no modification to the defective devices.

194.    Defendant provided Plaintiff Baron and Florida Class Members with an implied warranty that the Class Devices and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

195.    This implied warranty included, among other things: (i) a warranty that the Class Devices and their components, including their streaming screens, that were manufactured, supplied, distributed, and/or sold by Defendant were reliable for providing streamed workouts; and (ii) a warranty that the Class Devices would be fit for their intended use while the Class Devices were being operated.

196.    Contrary to the applicable implied warranties, the Class Devices and their components, including their streaming screens, at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Baron and Florida Class Members with reliable streamed workouts. Instead, the Class Devices are defective, beginning with the existence of the streaming Defect at the time of sale and thereafter. Defendant knew of this Defect at the time these sale transactions occurred.

197.    As a result of Defendant's breach of the applicable implied warranties, Plaintiff Baron and the Florida Class Members of the Class Devices suffered an ascertainable loss of money, property, and/or value of their Class Devices. Additionally, as a result of the Defect, Plaintiff Baron and the Florida Class Members were harmed and suffered actual damages in that the Class Devices' streaming components are substantially certain to fail before their expected useful life has run.

198.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Devices were of merchantable quality and fit for such use in violation of F.S.A. § 672.314.

199.    Plaintiff Baron and the Florida Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

200.    Plaintiff Baron and the Florida Class Members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of warranty would have been futile. Defendant was also on notice of the Defect from the complaints it received from Plaintiffs and the Class Members, from repairs and/or replacements of Class Device components thereof, and through other internal sources.

201.    As a direct and proximate cause of Defendant's breach, Plaintiff Baron and the Florida Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale of their Class Devices. Additionally, Plaintiff Baron and the Florida Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

202.     As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff Baron and the Florida Class Members have been damaged in an amount to be proven at trial.

**COUNT IX**
**VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW ("NYGBL") §349**
**N.Y. Gen Bus. Law § 349**
(on behalf of the New York Class)

203.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

204.     Plaintiff Millett brings this claim on behalf of the New York Class.

205.     The New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

206.     Plaintiff Millett and New York Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

207.     iFIT is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

208.     iFIT concealed the nature, scope, and severity of the Defect and failed to inform purchasers of Class Devices that the Class Devices were designed, manufactured, and sold containing the Defect, which would prevent them from streaming workouts.

209.     iFIT's deceptive acts and practices, which were intended to mislead consumers who purchased Class Devices, was conduct directed at consumers.

210.     iFIT consciously failed to disclose material facts to Plaintiff Millett and other New York Class members with respect to the use associated with the Class Devices.

211.    iFIT intended for Plaintiff Millett and New York Class members to rely on iFIT's acts of concealment and omissions, so that Plaintiff Millett and New York Class members would purchase the Class Devices.

212.    The foregoing acts, omissions and practices proximately caused Plaintiff Millett and New York Class members to suffer actual injury.

213.    Because iFIT's willful and knowing conduct caused injury to Plaintiff Millett and New York Class members, Plaintiff Millett seeks recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining iFIT's deceptive conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**<u>COUNT X</u>**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. § 2-314)**
**AND FITNESS FOR A PARTICULAR PURPOSE (N.Y. U.C.C. § 2-315)**
(on behalf of the New York Class)

214.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

215.    Plaintiff Millett brings this claim on behalf of the New York Class.

216.    iFIT is a "merchant" within the meaning of N.Y. U.C.C. §§ 2-314, 2-315.

217.    The Class Devices are "goods" within the meaning of N.Y. U.C.C. §§ 2-314, 2-315.

218.    iFIT's implied warranties of merchantability and fitness for a particular purpose accompanied the sale of the Class Vehicles to Plaintiff Millett and New York Class members.

219.    iFIT, by implication, warranted that the Class Devices were merchantable and fit for ordinary use.

220.    The Class Devices are not merchantable and/or fit for their ordinary purpose of providing streamed workouts to owners because, inter alia, the Class Devices suffer from inherent defects at the time of sale that render them not merchantable because no consumer would purchase them if they knew that they contained a Defect that prevented the very purpose for which they are marketed and sold (i.e., to stream workouts to the devices), and thereafter are not fit for their particular purpose of providing streamed workouts.

221.    As set forth herein, any effort by iFIT to disclaim or otherwise limit its responsibility for the defective Class Devices is unconscionable under all of the circumstances, including because iFIT knew that the Class Devices were unmerchantable and unfit for normal use. Through the conduct described herein, iFIT breached its implied warranty of merchantability and fitness for a particular purpose, and is therefore liable to Plaintiff Millett and New York Class members.

222.    Plaintiff Millett and New York Class members were in privity with iFIT through written warranty agreements relating to their Class Devices.

223.    As a direct and proximate cause of iFIT's breach of implied warranties, Plaintiff Millett and New York Class members have sustained damages and other losses in an amount to be determined at trial.

224.    Plaintiff Millett and New York Class members have provided timely notice to iFIT regarding the problems they experienced with the Class Devices and, notwithstanding such notice, iFIT has failed and refused to remedy the Defect.

<u>COUNT XI</u>
**BREACH OF EXPRESS WARRANTY**
**(N.Y. U.C.C. § 2-313)**
(on behalf of the New York Class)

225.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

226.    Plaintiff Millett brings this claim on behalf of the New York Class.

227.    As an express warrantor and manufacturer and merchant, iFIT had certain obligations under N.Y. U.C.C. § 2-313 to conform the Class Devices to the express warranties.

228.    When Plaintiff Millett and the New York Class members purchased their Class Devices, iFIT expressly warranted in writing that the Class Devices were covered by a warranty, and that warranty formed the basis of the bargain. As set forth herein, iFIT expressly warranted that the Class Devices were free from defects in workmanship and material and that if defects were to arise, iFIT would repair them and/or replace the Class Devices. Also, as set forth herein, iFIT breached its warranty obligations by selling inherently defective Class Devices and refusing to repair the defects or replace the defective parts or Class Devices.

229.    The defects at issue in this litigation were present at the time of sale to Plaintiff Millett and members of the New York Class.

230.    iFIT breached its warranties to repair and adjust defects in materials and workmanship of any part supplied by iFIT as it has refused to replace the defective parts that cause the Defect.

231.    Furthermore, the warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Millett and the New York Class members whole and because iFIT has failed and/or refused to adequately provide the promised remedies within a reasonable time.

232.    Pursuant to the express warranties, iFIT was obligated to pay for or reimburse Plaintiff Millett and the New York Class members for costs incurred in replacement parts and/or repairs to their Class Devices. iFIT was also obligated to repair the Defect in Class Devices.

233.    Accordingly, Plaintiff Millett and the New York Class members seek all remedies as allowed by law.

234.    Also, as alleged in more detail herein, at the time that iFIT warranted and sold the Class Devices, and while knowing that the Class Devices did not conform to iFIT's warranty and were inherently defective, iFIT wrongfully and fraudulently concealed material facts regarding the Class Devices. Plaintiffs and the New York Class members were therefore induced to purchase the Class Devices under false and/or fraudulent pretenses.

235.    iFIT and its agent dealers have failed and refused to conform the Class Devices to the express warranties, and iFIT's conduct has voided any attempt on its part to disclaim liability for its actions.

236.    iFIT was provided notice of the Defect in Class Devices through the receipt of numerous complaints regarding streaming and/or connectivity issues. iFIT has received, on information and belief, many complaints from New York Class members advising iFIT of the Defect at issue in this litigation.

237.    Plaintiff Millett and New York Class members have performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of iFIT or by operation of law in light of iFIT's unconscionable conduct.

238.    Plaintiffs have had sufficient dealings with either iFIT or its agents to establish privity of contract. Privity is not required in this case because Plaintiff Millett and the New York Class members are intended third-party beneficiaries of contracts between iFIT and its

resellers/dealers; specifically, they are the intended beneficiaries of iFIT's express warranties and these warranties were advertised to Plaintiff Millett and the New York Class members as the ultimate consumers. The dealers were not intended to be the ultimate consumers of the Class Devices and have no rights under the warranty agreements provided with the Class Devices; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

239.   As a direct and proximate result of iFIT's breach of express warranty, Plaintiff Millett and the New York Class members have been damaged in an amount to be determined at trial, including but not limited to diminution of value and benefit of the bargain damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class defined above, respectfully request that the Court enter judgment against Defendant and award the following relief:

A.   Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representatives of the Classes, and Plaintiffs' counsel as counsel for the Classes;

B.   An order awarding declaratory relief and temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.   Appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the Class Devices and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the Defect;

D.   An award of appropriate damages to repair or replace the Class Devices;

E.      A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

F.      An order awarding any applicable statutory and civil penalties;

G.      An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

H.      An award of costs, expenses, and attorneys' fees as permitted by law; and

I.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury on all issues so triable.

DATED: October 4, 2022                Respectfully submitted,

                                      By: _/s/ Ian Connor Bifferato_
                                          Ian Connor Bifferato (DE Bar No.3273)
                                          **THE BIFFERATO FIRM**
                                          1007 N Orange Street, 4th Floor
                                          Wilmington, DE 19801
                                          Telephone: (302) 429-0907
                                          cbifferato@tbf.legal

                                          Daniel O. Herrera
                                          Edward Khatskin
                                          **CAFFERTY CLOBES MERIWETHER**
                                          **& SPRENGEL LLP**
                                          150 S. Wacker Dr., Suite 3000
                                          Chicago, Illinois 60606
                                          Phone: (312) 782-4880
                                          Facsimile: (312) 782-4485
                                          dherrera@caffertyclobes.com
                                          ekhatskin@caffertyclobes.com

                                          Joseph G. Sauder
                                          Mark B. DeSanto
                                          **SAUDER SCHELKOPF**
                                          1109 Lancaster Avenue
                                          Berwyn, PA 19312
                                          Telephone: (888) 711-9975
                                          Facsimile: (610) 421-1326

jgs@sstriallawyers.com
mbd@sstriallawyers.com

*Attorneys for Plaintiffs*