# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| JOHN BARON and JOEL MILLET,<br><br>               Plaintiffs,<br><br>    v.<br><br>iFIT HEALTH AND FITNESS INC, a<br>Delaware Corporation,<br><br>               Defendant. | C.A. No. 1:22-cv-01304-JHS |

## OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS OR STAY CASE AND TO COMPEL ARBITRATION OR IN THE ALTERNATIVE TRANSFER VENUE OR DISMISS THE CLASS CLAIMS

Christopher Viceconte (No. 5568)
GIBBONS P.C.
300 Delaware Avenue, Suite 1015
Wilmington, DE 19801
(302) 518-6322
cviceconte@gibbonslaw.com

*Attorneys for Defendant*
*iFIT Health and Fitness Inc.*

OF COUNSEL:

Terry E. Welch (*pro hac vice*)
Robert S. Clark (*pro hac vice*)
Bryan S. Johansen (*pro hac vice*)
PARR BROWN GEE & LOVELESS LLP
101 S. 200 E., Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750
twelch@parrbrown.com
rclark@ parrbrown.com
bjohansen@parrbrown.com

Dated:  December 22, 2022

## Table of Contents

Table of Authorities ................................................................................................ ii

I.      Nature and Stage of the Proceedings .................................................. 1

II.     Summary of Argument ......................................................................... 2

III.    Statement of Relevant Facts................................................................. 3

       A.     The Nature of Defendant's Business .......................................... 3

       B.     The Terms of Use......................................................................... 3

       C.     Plaintiffs' Agreement to Terms of Use ...................................... 5

IV.    Argument ............................................................................................. 8

       A.     The Court Should Dismiss or Stay this Case and Compel the Parties to Arbitrate ................................................................................ 8

             1.     A Valid Agreement to Arbitrate Exists........................... 9

             2.     This Court Must Compel Individual Arbitration as the Parties Agreed that the Arbitrator would Determine the Scope of Any Arbitration Agreement. .............................................. 13

             3.     The Arbitration Agreement Covers this Dispute. ......... 16

       B.     Alternatively, this Court Should Transfer the Case to the Agreed-Upon Forum. ....................................................................................... 17

       C.     Alternatively, this Court Should Dismiss the Class Claims ..................... 19

V.     Conclusion .......................................................................................... 20

# Table of Authorities

Page(s)

## Cases

*Belnap v. Iasis Healthcare,*
  844 F.3d 1272 (10th Cir. 2017) ........................................................................... 15

*Adtile Techs. Inc. v. Perion Network Ltd.,*
  192 F. Supp. 3d 515 (D. Del. 2016) ...................................................................... 14

*Am. Express Co. v. Italian Colors Rest.,*
  570 U.S. 228 (2013) ............................................................................................... 20

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) .......................................................................................... 8, 20

*AT&T Techs., Inc. v. Comm'n Workers of Am.,*
  475 U.S. 643 (1986) ......................................................................................... 16, 17

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas,*
  571 U.S. 49 (2013) ...................................................................................... 18, 19, 20

*Auromedics Pharma LLC v. Ingenus Pharms., LLC,*
  No. CV 20-1235-CFC-JLH, 2021 WL 3048406 (D. Del. July 20, 2021) ............ 14

*Camilo v. Uber Techs., Inc.,*
  No. 17-cv-9508, 2018 WL 2464507 (S.D.N.Y. May 31, 2018) ............................ 20

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.,*
  No. 08 CIV. 5463 CM GWG, 2011 WL 744732 (S.D.N.Y. Mar. 1, 2011) ............. 11

*Chassen v. Fid. Nat'l Fin., Inc.,*
  836 F.3d 291 (3d Cir. 2016) .................................................................................. 14

*Chesapeake Appalachia, LLC v. Scout Petroleum, LLC,*
  809 F.3d 746 (3d Cir. 2016) .................................................................................. 15

*Compass iTech, LLC v. eVestment All., LLC,*
  No. 14-81241-CIV, 2016 WL 10519027 (S.D. Fla. June 24, 2016) ...................... 11

*Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds,*
  974 F.3d 386 (3d Cir. 2020) .................................................................................. 12

*Davis v. USA Nutra Labs,*
  303 F. Supp. 3d 1183 (D.N.M. 2018) .................................................................... 12

*Dean Witter Reynolds, Inc. v. Byrd,*
  470 U.S. 213 (1985) ............................................................................................... 15

*Dorco Co. Ltd. v. Gillette Co. LLC,*
  No. CV 18-1306-LPS-CJB, 2019 WL 1874466 (D. Del. Mar. 18, 2019) ............. 16

*Elsken v. Network Multi-Family Sec. Corp.,*
  49 F.3d 1470 (10th Cir. 1995) .............................................................................. 13

*First Options of Chicago, Inc. v. Kaplan,*
  514 U.S. 938 (1995) ........................................................................................... 9, 10

*Flintkote Co. v. Aviva PLC,*
  769 F.3d 215 (3d Cir. 2014) .................................................................................. 13

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012)......................................................................... 13

*GNH Grp., Inc. v. Guggenheim Holdings, L.L.C.*,
    No. CV 19-1932-CFC, 2020 WL 4287358 (D. Del. July 27, 2020)......................... 14

*Hancock v. AT&T Co.*,
    701 F.3d 1248 (10th Cir. 2012) ................................................................................ 12

*High v. Balun*,
    943 F.2d 323 (3d Cir. 1991)........................................................................................ 9

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002).................................................................................................... 13

*Hugger-Mugger, L.L.C. v. Netsuite, Inc.*,
    No. 2:04-cv-592, 2005 WL 2206128 (D. Utah Sept. 12, 2005) ............................... 12

*In re: Howmedica Osteonics Corp*,
    867 F.3d 390 (3d Cir. 2017)...................................................................................... 19

*James v. Glob. TelLink Corp*,
    852 F.3d 262 (3d Cir. 2017)...................................................................................... 12

*Juju, Inc. v. Native Media, LLC*,
    No. CV 19-402-CFC, 2020 WL 3208800 n.1, n.6 (D. Del. June 15, 2020) ............. 11

*Jumara v. State Farm Ins. Co.*,
    55 F.3d 873 (3d Cir. 1995)........................................................................................ 18

*Liberty Ins. Underwriters, Inc. v. Cocrystal Pharma, Inc.*,
    No. 119-CV-02281-JDW-CJB, 2022 WL 1624363 (D. Del. May 23, 2022)............. 9

*Lloyd v. HOVENSAA, LLC.*,
    369 F.3d 263 (3d Cir. 2004)...................................................................................... 16

*Medtronic AVE Inc. v. Cordis Corp.*,
    100 F. App'x 865 (3d Cir. 2004) .............................................................................. 16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Shaddock*,
    822 F. Supp. 125 (S.D.N.Y. 1993) ........................................................................... 17

*Micro Focus (US), Inc. v. Ins. Servs. Off., Inc.*,
    No. CV 15-252-RGA, 2021 WL 4061141 (D. Del. Sept. 7, 2021) ......................... 11

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)...................................................................................................... 16

*Nazaruk v. eBay, Inc.*,
    No. 2:06CV242, 2006 WL 2666429 (D. Utah Sept. 14, 2006) ............................... 12

*Nidec Corp. v. Seagate Tech. LLC*,
    No. 21-52-RGA, 2021 WL 3048456 (D. Del. July 20, 2021) .................................. 16

*Rent-A-Ctr., W., Inc. v. Jackson*,
    561 U.S. 63 (2010).................................................................................................... 13

*Semenov v. Hill*,
    982 P.2d 578 (Utah App. 1999) ............................................................................... 13

*Shutte v. Armco Steel Corp.*,
    431 F.2d 22 (3d Cir. 1970)........................................................................................ 18

*Talley v. Gen. Motors, LLC*,
    No. 1:20-CV-01137-SB, 2021 WL 7209448 (D. Del. Nov. 26, 2021)...................... 20

*Temple v. Best Rate Holdings LLC*,
    360 F. Supp. 3d 1289 (M.D. Fla. 2018) ................................................................... 11

*United States v. United States Sugar Corp.*,
    No. CV 21-1644 (MN), 2022 WL 354228 (D. Del. Jan. 11, 2022)............................................ 18
*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers, Int'l*
    *Union, AFL-CIO-CLC v. E.I. DuPont de Nemours & Co.*,
    549 F. Supp. 2d 585 (D. Del. 2008)........................................................................................ 17
*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    464 F. Supp. 3d 634 (S.D.N.Y. 2020)..................................................................................... 11
*Wright v. City of Wilmington*,
    No. 13-1966-SLR-SRF, 2016 WL 356023 (D. Del. Jan. 28, 2016) ........................................ 20

Statutes

9 U.S.C. § 2.................................................................................................................................... 8
9 U.S.C. § 4.................................................................................................................................... 8
28 U.S.C. § 1404(A) .......................................................................................................... 2, 17, 18

Rules

Fed. R. Civ. P. 12(f)..................................................................................................................... 20
Federal Rule of Civil Procedure 23(d)(1)(D)............................................................................... 20
Rules 7(b) and 12(b)(1), (6), and 23(d)(1)(D) of the Federal Rules of Civil Procedure ............... 2

## I.  NATURE AND STAGE OF THE PROCEEDINGS

On October 4, 2022, plaintiffs/putative class representatives John Baron and Joel Millett (collectively "Plaintiffs") filed the Class Action Complaint (the "Complaint") against defendant iFIT Health & Fitness Inc. ("iFIT" or "Defendant").  Plaintiffs filed the Complaint on their own behalf and purportedly on behalf of a nationwide class, defined as "All persons or entities in the United States who purchased an iFIT Class Device," and purportedly on behalf of Florida and New York subclasses, defined as "All persons or entities who purchased an iFIT Class Device" in Florida or New York, respectively.  [Complaint (D.I. 1) ¶ 95.]

The Complaint asserts that iFIT has breached express and implied warranties, violated federal and Florida and New York state warranty statutes, violated New York and Florida state deceptive and unfair trade practices statutes, made negligent misrepresentations, and engaged in fraudulent concealment.  Each of Plaintiffs' claims generally stem from the allegation that the "Class Devices suffer from a Defect that results in streaming disruption due to, *inter alia*, buffering, freezing, poor audio/visual quality, and/or total video failure. The Defect effectively renders inoperable Class Devices, depriving Plaintiffs and the Class of the benefit of their bargain." [Complaint (D.I. 1) ¶ 58.]

As a result of the alleged breach of warranties and representations, Plaintiffs assert that they and the putative class members are entitled to monetary damages of no less than $5,000,000, attorneys' fees, costs, prejudgment interest, and various equitable relief.  [*Id.* (D.I. 1) ¶ 38, pp. 52-53.]

iFIT now moves to dismiss or stay the Complaint and respectfully submits this Opening Brief in support of its motion.

1

## II.  SUMMARY OF ARGUMENT

1.      Under Rules 7(b) and 12(b)(1), (6), and 23(d)(1)(D) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1404(A), iFIT hereby moves this Court to dismiss or stay this case and compel arbitration, or, in the alternative, to transfer this case to the Federal District Court for the District of Utah, Northern Division, based upon the written consent of the parties, or, lastly, to dismiss the class-related aspects of the Complaint filed by Plaintiffs.

2.      Plaintiffs seek to litigate in this Court a claim relating to streaming capabilities of iFIT fitness programs and representations related thereto—a claim that they both agreed to resolve exclusively by individual arbitration, not in court and not in a class action.  The agreed-upon Terms of Use for using iFIT devices and services unequivocally state that disputes must be resolved through arbitration at the election of Defendant.

3.      Under well-settled law in this Circuit, Plaintiffs' consent to the Terms of Use for using iFIT devices and services requires the Court to stay this lawsuit and refer this dispute to mandatory, individual arbitration.

4.      In the alternative, if the Court does not compel arbitration, the Court should transfer this lawsuit to the United States District Court for the District of Utah, Northern Division, based upon the agreement of the parties and 28 U.S.C. § 1404(a).

5.      Lastly, if the Court does not compel arbitration or transfer the case to the agreed upon forum, the Court should strike the class allegations of the Complaint as Plaintiffs expressly waived their right to assert claims on behalf of a class.

### III. STATEMENT OF RELEVANT FACTS

#### A.    The Nature of Defendant's Business

iFIT is a leading provider of at-home and commercial workout information, materials, programming, and training-support technology.  NordicTrack is a brand under which iFIT markets and sells exercise equipment such as stationary bicycles and treadmills.

In addition to selling NordicTrack-branded stationary bicycles and treadmills, iFIT also operates and sells iFIT memberships.  [*See* Declaration of Tyson Facer ("Facer Decl."), submitted contemporaneously herewith, ¶¶ 3-4.]  iFIT connects individuals with fitness coaching, whether through smart-device applications, or touchscreens on workout equipment.  [*Id.*]  Many individuals who purchase NordicTrack equipment also register for iFIT memberships, so that they can access iFIT's training-support technology during their workouts.  [*Id.*]  However, NordicTrack equipment will operate without an iFIT membership. [*Id.* ¶ 4]

#### B.    The Terms of Use

The opening paragraph of the iFIT Terms agreed to by Plaintiffs states as follows:

> These terms of use are entered into by and between You and iFIT Inc., (together with its affiliates, partners, licensors, subsidiaries, and/or related companies, "iFIT," "us," "our," or "we"). The following terms and conditions, together with any guidelines, policies, rules notices, or other ancillary agreements, which are expressly incorporated by reference, including without limitation the Privacy Policy [LINK] (these "Terms of Use") govern your access to and use of the iFIT websites, (each, an "iFIT Site," and, collectively the "iFIT Sites"), along with any downloadable applications, services, Content (as hereinafter defined), or interface provided by us, including iFIT Services and iFIT-controlled social media pages (including Facebook, Instagram, and Twitter), (individually, an "iFIT Service," and collectively, the "iFIT Services"). Certain iFIT Services or materials may be subject to supplemental terms and conditions; your use of those iFIT Services is subject to such additional terms and conditions, which are hereby incorporated by reference.

> BY USING AN iFIT SITE OR iFIT SERVICES, YOU AGREE TO BE BOUND BY THESE TERMS OF USE, THE PRIVACY POLICY [LINK], AND/OR ANY OTHER POLICY REFERENCED HEREIN. IF YOU DO NOT WISH TO BE BOUND BY THESE TERMS OF USE, YOU MUST DISCONTINUE YOUR USE OF THE iFIT SITES AND iFIT SERVICES. THESE TERMS OF USE BECOME EFFECTIVE IMMEDIATELY UPON COMMENCEMENT OF YOUR USE OF AN iFIT SITE.

[*See* Facer Decl., Exhibit 3 ("September 2021 iFIT Terms") at 1; *see also*, *e.g*., Exhibit 1 ("January 2019 iFIT Terms") at 1; Exhibit 2 ("September 2019 iFIT Terms") at 1 (collectively, the "iFIT Terms").]

Since the Fall of 2018—before Plaintiffs purchased their S22i bikes and signed up for iFIT—the Terms of Use that govern access to iFit.com have included the following arbitration agreement:

> You acknowledge and agree that ICON[1] may, at its sole discretion, require you to submit any disputes arising from the use of these Terms of Use or the ICON Sites, including disputes arising from or concerning their interpretation, violation, invalidity, non-performance, or termination, to final and binding arbitration under the Rules of Arbitration of the American Arbitration Association applying Utah law.

[*See* Facer Decl., January 2019 iFIT Terms at 9–10; September 2019 iFIT Terms at 11; *see also*, *e.g*., September 2021 iFIT Terms at p. 30.]

The iFIT Terms state that as to "any disputes or claims not subject to arbitration [at the election of iFIT] (as set forth below), you agree to commence or prosecute any action in

---

[1] On August 9, 2021, a Certificate of Amendment of Certificate of Incorporation of ICON Health & Fitness, Inc. was filed with the Secretary of State of the State of Delaware changing the name of ICON Health & Fitness, Inc. to iFIT Inc.

connection therewith in the State of Utah, Cache County." [January 2019 iFIT Terms at 9; September 2019 iFIT Terms at 11; September 2021 iFIT Terms at pp. 29-30.]

The iFIT Terms also provide that subscribers "acknowledge and agree that you may only resolve disputes with us on an individual basis"—not "as a plaintiff or a class member in a class, consolidated, or representative action." [January 2019 iFIT Terms at 9; September 2019 iFIT Terms at 10–11; September 2021 iFIT Terms at p. 29.] The class-action waiver specifies that "[c]lass arbitrations ... are not allowed." [*Id.*]

Individuals who sign up for iFIT memberships must agree to the iFIT Terms. [*See* Facer Decl. ¶ 5.] The iFIT Terms are readily available, and frequently presented to, users online. [*See id.* ¶¶ 6-7.]

### C.    Plaintiffs' Agreement to Terms of Use

*1.   Joel Millett Agreed to iFIT's Terms of Use.*

In August 2019, Joel Millett allegedly purchased an S22i studio cycle bike. [Complaint (D.I. 1) ¶ 28.] On or around August 23, 2019, Joel Millett acquired an iFIT membership and became an iFIT member through iFit.com. [*See* Facer Decl. ¶ 11.] As of August 23, 2019, when Joel Millett signed-up for an iFIT membership on iFit.com, users were required to click a box that said "Purchase for $X," with X representing the purchase price (for users with an "activation code," the purchase price was zero). [*See id.* ¶ 12.] Below that box was a statement that read, "By clicking submit, you agree to the **Terms of Service.**" [*Id.*, emphasis in original.] Terms of Service appeared in bold, blue font, and hyperlinked directly to the iFIT terms available on iFit.com. [*Id.*]

iFIT's records show that Mr. Millett clicked the box agreeing to the Terms of Service on the iFIT membership registration page. [*Id.* ¶ 25.] Before clicking the box, Mr. Millett could have taken as long as he wished to review the iFIT Terms. [*Id.* ¶ 18.] If Mr. Millett opted to click the

Terms of Use hyperlink on the registration page, it would have directed him to the January 2019 iFIT Terms. [*Id.* ¶ 14.]

Mr. Millett manually renewed his iFIT membership on August 16, 2020, January 4, 2021, and August 18, 2022 during which times he reaffirmed his agreement to the iFIT Terms. [*See* Facer Decl. ¶¶ 19-21.] Specifically, all manual iFIT membership renewals are processed through each member's user portal on iFit.com. [*Id.* ¶ 15.] In the member portal, after selecting the type of membership renewal desired, the member must enter a payment method. [*Id.* ¶ 16.] After entering an approved payment method, the "PLACE ORDER" button activates. [*Id.*] Below the "PLACE ORDER" button, it states "By clicking 'PLACE ORDER,' you agree to the Terms of Use and Privacy Policy." [*Id.*] The phrase "Terms of Use" appears in a different color font and hyperlinks directly to the iFIT Terms. [*Id.*] If a member clicks on the "Terms of Use" hyperlink on the membership renewal page, the member could take as long as the member desires to review the iFIT Terms before agreeing to place the order for the membership renewal. [*Id.* ¶ 18.]

If Mr. Millett clicked on the Terms of Use hyperlink when he manually renewed his membership on August 16, 2020 or January 4, 2021, he would have been directed to the September 2019 iFIT Terms. [*Id.* ¶ 20.] If Mr. Millett clicked on the Terms of Use hyperlink when he manually renewed his membership on August 18, 2022 he would have been directed to the September 11, 2019 iFIT Terms. [*Id.* ¶ 21.]

Mr. Millett continues to be an iFIT subscriber and continues to have access to an extensive library of on demand classes and workouts through his iFIT subscription. [*See*, *e.g*., Facer Decl. ¶ 11 (authenticating the Order history of Joel Millett, which reflects renewal of his iFIT membership on August 18, 2022).]

2. *John Baron Agreed to iFIT's Terms of Use*.

6

In June 2022, John Baron allegedly purchased an S22i studio cycle bike.  [Complaint (D.I. 1) ¶ 18.]  On or around September 8, 2022, John Baron acquired an iFIT membership and became an iFIT member through iFit.com.  [*See* Facer Decl. ¶ 22.]  As of September 8, 2022, when John Baron signed-up for an iFIT membership on iFit.com, the first screen that appears provides options for the user to sign up for an iFIT membership through their Apple, Facebook, Google, or Planet Fitness accounts; or by creating a new account with iFIT.  [*Id*. ¶ 23.]  Regardless of the method used, each user seeking to obtain an iFIT membership must click a box that says "I have read and agree to iFIT's Terms of Use and Privacy Policy."  [*Id*.]  The Terms of Use appear in bold and hyperlink directly to the iFIT terms available on iFIT.com.  [*Id*.]

iFIT's records show that Mr.  Baron clicked the box agreeing to the Terms of Service on the iFIT membership registration page.  [*Id*. ¶ 25.]  Before clicking the box, Mr. Baron could have taken as long as he wished to review the iFIT Terms.  [*Id.*]  If Mr. Baron opted to click the Terms of Use hyperlink on the registration page, it would have directed him to the September 2021 iFIT Terms.  [*Id.* ¶ 24.]

Mr. Baron continues to be an iFIT subscriber and continues to have access to an extensive library of on demand classes and workouts through his iFIT subscription.  [*See*, *e.g*., Facer Decl. ¶ 22.]

### D.    Plaintiffs' Claims

The Complaint asserts that iFIT has breached express and implied warranties, violated federal and Florida and New York state warranty statutes, violated New York and Florida state deceptive and unfair trade practices statutes, made negligent misrepresentations, and engaged in fraudulent concealment.  [*See generally*, Complaint (D.I. 1).]  Each of Plaintiffs' claims generally stem from the allegation that the "Class Devices suffer from a Defect that results in streaming disruption due to, *inter alia*, buffering, freezing, poor audio/visual quality, and/or total video

failure.  The Defect effectively renders inoperable Class Devices, depriving Plaintiffs and the Class

of the benefit of their bargain." [Complaint (D.I. 1) ¶ 58.]

## IV. ARGUMENT

This Court should dismiss or stay this case and compel Plaintiffs to abide the iFIT Terms,

which Plaintiffs affirmatively accepted.  The iFIT Terms are clear: Disputes regarding the use of

the iFIT site and streaming services must be resolved through binding arbitration.

If, however, the Court determines that Plaintiffs need not arbitrate this dispute, then the

Court should transfer the dispute to Utah, the forum Plaintiffs agreed to on multiple occasions.

And finally, if the Court does not compel arbitration or transfer the dispute to Utah, the

Court should strike all class claims as Plaintiffs have explicitly waived such claims.

### A. The Court Should Dismiss or Stay this Case and Compel the Parties to Arbitrate

Under the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation

of any contract."  9 U.S.C. § 2.  The FAA reflects a "liberal federal policy favoring arbitration,"

and courts must "enforce [arbitration agreements] according to their terms."  *AT&T Mobility LLC*

*v. Concepcion*, 563 U.S. 333, 339 (2011) (citation and internal quotation marks omitted).

Likewise, under the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of

another to arbitrate under a written agreement for arbitration may petition any United States district

court … for an order directing that such arbitration proceed in the manner provided for in such

agreement."  9 U.S.C. § 4.

Here, the parties entered into a valid agreement that provides the parties shall arbitrate their

disputes, individually, upon the election of Defendant.  Plaintiffs have refused to consent to

arbitrate this dispute thus requiring this motion.  Likewise, the parties expressly agreed that the

scope of the agreement to arbitrate will be determined by the arbitrator.  As a result, this Court should dismiss or stay this case and compel the parties to arbitrate their dispute individually as agreed.

### 1.   A Valid Agreement to Arbitrate Exists.

The question of whether Plaintiffs agreed to arbitrate by accepting the iFIT Terms is governed by "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Here, a conflict-of-law analysis might consider the laws of Utah[2], Delaware, New York, or Florida.

However, a choice-of-law analysis is unnecessary because, as shown below, there is no conflict among the applicable states' laws strongly favoring enforcement of "clickwrap" agreements like the one at issue here.  *See, e.g.*, *High v. Balun*, 943 F.2d 323, 325 (3d Cir. 1991) ("Where the application of either state's law would yield the same result, no conflict exists to be resolved." (internal citation omitted)); *Liberty Ins. Underwriters, Inc. v. Cocrystal Pharma, Inc.*, No. 119-CV-02281-JDW-CJB, 2022 WL 1624363 (D. Del. May 23, 2022) ("If the outcome would be the same under either state's law, then 'there is a "false conflict,"' and the Court should avoid the choice-of-law analysis altogether.").

---

[2] Notably, Plaintiffs expressly agreed through the acceptance of the Terms of Use that this dispute is governed by Utah law:

> By accessing the iFIT Sites or iFIT Services, both of us agree that the statutes and laws of the State of Utah, without regard to the conflicts of laws principles thereof, will apply to all matters relating to the use of the iFIT Sites and the purchase of iFIT Services available through the iFIT Sites.

[January 2019 iFIT Terms at 9–10; September 2019 iFIT Terms at 11; *see also*, September 2021 iFIT Terms at 29-30.]

Under "ordinary state-law principles that govern the formation of contracts," *First Options*, 514 U.S. at 944, Plaintiffs affirmatively agreed to the Arbitration Agreement.

On multiple occasions, Mr. Millett affirmatively accepted the iFIT Terms, including the agreement to arbitrate.  On or around August 23, 2019, Mr. Millett activated his iFIT membership and became an iFIT member through iFit.com.  [*See* Facer Decl. ¶ 11.]  As of August 23, 2019, when Mr. Millett signed-up for an iFIT membership on iFit.com, users were required to click a box that said "Purchase for $X," with X representing the purchase price (for users with an "activation code," the purchase price was zero).  [*See id.* ¶ 12.] Below that box was a statement that read, "By clicking submit, you agree to the **Terms of Service.**"  [*Id.*, emphasis in original.] Terms of Service appeared in bold, blue font, and hyperlinked directly to the iFIT terms available on iFit.com. [*Id.*]

Furthermore, when Mr. Millett manually renewed his iFIT membership on August 16, 2020, January 4, 2021, and August 18, 2022, Mr. Millett clicked the "PLACE ORDER" button, which expressly indicated that by so clicking, Mr. Millett "agree[ed] to the Terms of Use," which included the agreement to arbitrate. [*See id.* ¶¶ 19-21.]

Likewise, Mr. Baron expressly assented to iFIT Terms, including the agreement to arbitrate with the AAA.  When John Baron signed-up for an iFIT membership on iFit.com, the first screen that appears provides options for the user to sign up for an iFIT membership through their Apple, Facebook, Google, or Planet Fitness accounts; or by creating a new account with iFIT.  [*Id.* ¶ 23.] Regardless of the method used, each user seeking to obtain an iFIT membership must click a box that says, "I have read and agree to iFIT's Terms of Use and Privacy Policy."  [*Id.*]  The Terms of Use appear in bold and hyperlink directly to the iFIT terms available on iFIT.com.  [*Id.*]

iFIT's records show that Mr. Baron clicked the box agreeing to the Terms of Service on the iFIT membership registration page. [*Id.* ¶ 25.] Before clicking the box, Mr. Baron could have taken as long as he wished to review the iFIT Terms. [*Id.* ¶ 24.] If Mr. Baron opted to click the Terms of Use hyperlink on the registration page, it would have directed him to the September 2021 iFIT Terms. [*Id.*]

Thus, the iFIT Terms are a classic example of an enforceable "clickwrap" agreement, which "requires a webpage user [to] manifest assent to the terms of a contract," usually by clicking a box or toggling a button. *Micro Focus (US), Inc. v. Ins. Servs. Off., Inc.*, No. CV 15-252-RGA, 2021 WL 4061141, at *6 (D. Del. Sept. 7, 2021) (internal quotations omitted); *see also Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) ("The Second Circuit routinely enforces clickwrap agreements as valid and binding contracts . . . . [T]he terms may be binding and enforceable even if they are only accessible through a hyperlink."); *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1302 (M.D. Fla. 2018) (explaining that "clickwrap agreements require the user to physically manifest assent"). In Delaware, "Courts consider clicking to accept a 'clickwrap' agreement as a manifestation of assent to the contract," meaning that "[c]lickwrap agreements are routinely recognized by courts and are enforceable under Delaware law." *Id.*; *see also Juju, Inc. v. Native Media, LLC*, No. CV 19-402-CFC, 2020 WL 3208800, at *2 n.1, n.6 (D. Del. June 15, 2020) (finding that a clickwrap agreement would represent assent if defendants chose to maintain that claim); *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08 CIV. 5463 CM GWG, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) ("In New York, clickwrap agreements are valid and enforceable contracts."); *Compass iTech, LLC v. eVestment All., LLC*, No. 14-81241-CIV, 2016 WL 10519027, at *15 (S.D. Fla. June 24, 2016) ("In Florida . . . clickwrap agreements are valid and enforceable contracts.") (quotations omitted).

While Utah state courts have not yet directly addressed this issue, the Utah federal district court and other courts within the Tenth Circuit recognize and enforce clickwrap agreements. *See, e.g.*, *Hancock v. AT&T Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012) (declaring that "courts generally uphold clickwrap agreements"); *Hugger-Mugger, L.L.C. v. Netsuite, Inc.*, No. 2:04-cv-592, 2005 WL 2206128, at *6 (D. Utah Sept. 12, 2005) (finding clickwrap agreement enforceable under California law); *Nazaruk v. eBay, Inc.*, No. 2:06CV242, 2006 WL 2666429, at *3 (D. Utah Sept. 14, 2006) (enforcing forum selection clause in clickwrap agreement). "Courts evaluate whether a clickwrap agreement's terms were clearly presented to the consumer, the consumer had an opportunity to read the agreement, and the consumer manifested an unambiguous acceptance of the terms." *Hancock*, 701 F.3d at 1256.

Moreover, the terms and conditions of such agreements may be incorporated through a hyperlink, so long as the hyperlink is conspicuous. *See, e.g.*, *James v. Glob. TelLink Corp*, 852 F.3d 262, 267 (3d Cir. 2017) (noting that whether hyperlinked terms and conditions are enforceable usually turns on whether the hyperlink is "reasonably conspicuous" on the website); *Davis v. USA Nutra Labs*, 303 F. Supp. 3d 1183, 1190–91 (D.N.M. 2018) ("Notably, federal courts have consistently enforced clauses contained in clickwrap agreements ..., where the agreement is presented via a hyperlink to a page separate from the one containing the box or button manifesting assent.") (internal quotation marks and alterations omitted). Where a user accepts the terms and conditions with an opportunity to review them, whether the user actually read the terms and conditions is immaterial. "In short, '[f]ailing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading.'" *MXM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 404 (3d Cir. 2020) (internal citations omitted)); *see also, Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) ("Failure

12

to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract.") (citation and internal quotation marks omitted); *Semenov v. Hill*, 982 P.2d 578, 581 (Utah App. 1999) ("[W]here a person signs a document . . . he will be bound by all of its provisions"); *Elsken v. Network Multi-Family Sec. Corp.*, 49 F.3d 1470, 1474 (10th Cir. 1995) (interpreting the same standard applied by Utah to reach the conclusion that "a party who signs a contract without reading it cannot avoid its legal effect on the ground that it did not read the contract or that the contents of the contract were not known to the party").

Accordingly, the agreement to arbitrate in the iFIT Terms is valid and enforceable.

### 2. This Court Must Compel Individual Arbitration as the Parties Agreed that the Arbitrator would Determine the Scope of the Agreement.

The Supreme Court has held "that a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability,'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). In general, the question of whether the parties have submitted a particular dispute to arbitration, *i.e.*, a question of arbitrability, is decided by a court. *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (explaining that to compel arbitration, the court must determine "(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement" (internal quotations omitted)).

Nonetheless, arbitrability questions are properly decided by an arbitrator when there is "clear and unmistakable evidence" that the parties intended to submit issues of arbitrability to the arbitrator. *Howsam*, 537 U.S. at 83; *see also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 79 (2010); *GNH Grp., Inc. v. Guggenheim Holdings, L.L.C.*, No. CV 19-1932-CFC, 2020 WL 4287358, at *3 (D. Del. July 27, 2020) ("[I]f there is 'clear and unmistakable' evidence that the parties delegated threshold arbitrability questions to an arbitrator in their agreement, then all such

issues, including whether the agreement covers a particular controversy, must be determined by the arbitrator."); *see also Chassen v. Fid. Nat'l Fin., Inc.*, 836 F.3d 291, 304 n.17 (3d Cir. 2016) ("The scope of an arbitration clause is decided by the court absent clear and unmistakable evidence that the parties agreed to submit this issue to the arbitrator.").

Courts have found that by incorporating specific arbitration rules that indicate that the question of arbitrability should be decided by the arbitrator, then such incorporation shows that the parties "clearly and unmistakably" agreed to have the arbitrator determine arbitrability.  *See Guggenheim Holdings, L.L.C.*, 2020 WL 4287358 at *5 n.3) ("[T]he Third Circuit has concluded that where an arbitration provision provides for arbitration of a wide array of potential claims and incorporates AAA Rules giving the arbitrator the power to decide issues of arbitrability, this constitutes clear and unmistakable evidence that the parties intended the arbitrator decide those issues."); *see also Auromedics Pharma LLC v. Ingenus Pharms., LLC*, No. CV 20-1235-CFC-JLH, 2021 WL 3048406, at *4 (D. Del. July 20, 2021) (concluding that incorporation of the AAA arbitration rules "is clear evidence that the parties intended to refer the question of arbitrability to an arbitrator"); *Adtile Techs. Inc. v. Perion Network Ltd.*, 192 F. Supp. 3d 515, 526 (D. Del. 2016) (holding that, because the arbitration agreement incorporated the JAMS Comprehensive Arbitration Rules, the arbitrator would determine the arbitrability of disputed claims, including misappropriation of trade secrets, unfair competition, and common law unfair competition).  The Third Circuit itself has observed, though not held, that "virtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."  *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763 (3d Cir. 2016) (internal citations omitted).

The Tenth Circuit is also in accord.  In *Belnap v. Iasis Healthcare*, it held that incorporation of the JAMS Rules—which it noted were "substantively identical" to the AAA rules incorporated into the JV Agreement—constitutes clear and unmistakable evidence of an agreement to arbitrate arbitrability.  844 F.3d 1272, 1283-84 (10th Cir. 2017).

Here, the arbitration agreement in the iFIT Terms provides for arbitration "under the Rules of Arbitration of the American Arbitration Association applying Utah law."  [iFIT Terms.]  The Rules of Arbitration of the American Arbitration Association ("AAA") state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, Rule R-7(a) (2013).

By incorporating the AAA rules, the iFIT Terms clearly and unmistakably delegated the question of arbitrability to the arbitrator.  This Court need not determine, therefore, whether Plaintiffs' precise claims are subject to the arbitration agreement; Plaintiffs agreed that the arbitrator would make that determination.  This Court need only compel arbitration in accordance with the arbitration agreement.

Accordingly, when the two fundamental questions are decided in favor of arbitration (*i.e.*, that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement), as they are here, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218–19 (1985).

Indeed, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone Memorial Hosp. v.*

*Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see Nidec Corp. v. Seagate Tech. LLC*, No. 21-52-RGA, 2021 WL 3048456, at *1 (D. Del. July 20, 2021) (recognizing the "liberal federal policy favoring arbitration agreements" and concluding that "a court should generally resolve doubts as to the scope of an arbitration clause in favor of arbitration").  Once the Court directs the parties to proceed to arbitration, it must grant a stay pending arbitration.  *Lloyd v. HOVENSAA, LLC.*, 369 F.3d 263, 269 (3d Cir. 2004); *Dorco Co. Ltd. v. Gillette Co. LLC*, No. CV 18-1306-LPS-CJB, 2019 WL 1874466, at *1 (D. Del. Mar. 18, 2019) ("If a court determines that the issue is arbitrable pursuant to an agreement between the parties, it must stay the suit until arbitration is complete.").

### 3.  The Arbitration Agreement Covers this Dispute.

Although the Court need not and should not reach issues of scope, this dispute falls squarely within the arbitration agreement, which applies to "any disputes arising from the use of these Terms of Use or the iFIT Sites."  The term "iFIT Sites" is defined to include any of the iFIT websites, including iFit.com, through which Plaintiffs accessed the streaming classes and programs.  [iFIT Terms at 1.]

In assessing the scope of an agreement to arbitrate, courts apply a "presumption of arbitrability," meaning the court must order arbitration absent "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Techs., Inc. v. Comm'n Workers of Am.*, 475 U.S. 643, 650 (1986) (internal quotation marks omitted); *see, e.g.*, *Medtronic AVE Inc. v. Cordis Corp.*, 100 F. App'x 865 (3d Cir. 2004) (applying the presumption of arbitrability and adopting "broad construction" of arbitration provision).  Only "the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."  *AT&T*, 475 U.S. at 650 (internal quotation marks omitted).  Here, Plaintiffs' various claims that iFIT breached written and implied warranties and allegedly made false statements or representations by failing to provide consistent streaming of fitness classes through the iFIT Sites, *see generally,*

Complaint, plainly "arise from the use of . . . the iFIT Sites." The case, therefore, falls directly within the scope of the arbitration agreement. *See, e.g.*, *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers, Int'l Union, AFL-CIO-CLC v. E.I. DuPont de Nemours & Co.*, 549 F. Supp. 2d 585 (D. Del. 2008) ("[T]he Third Circuit has held that a clause requiring arbitration of 'any dispute arising out of a claimed violation of this Agreement' is a 'broad' arbitration clause."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Shaddock*, 822 F. Supp. 125, 132 (S.D.N.Y. 1993) ("[W]here the agreement contains a 'broad' arbitration clause, such as the one at issue here, purporting to submit to arbitration 'any controversy between us arising out of your business or this agreement,' the strong presumption in favor of arbitrability has been held to apply with even greater force.").

**B.**     **Alternatively, this Court Should Transfer the Case to the Agreed-Upon Forum.**

Assuming *arguendo* that the Court declines to submit this dispute to binding arbitration, then, under 28 U.S.C. § 1404(a) and the iFIT Terms, it should transfer the case to the United States District Court for the District of Utah, Northern Division.

The Terms of Use includes the following forum-selection clause:

> With respect to any disputes or claims not subject to arbitration (as set forth below), you agree to commence or prosecute any action in connection therewith in the State of Utah, Cache County, and you hereby consent to, and waive all defenses of lack of personal jurisdiction and forum non conveniens with respect to, venue and jurisdiction.

[January 2019 iFIT Terms 9; September 2019 iFIT Terms 11; September 2021 iFIT Terms at 29-30.]

Section 1404(a) states that for "the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." The

17

Supreme Court has held that forum-selection clauses such as the one in the iFIT Terms are enforceable and that courts should take them into consideration when addressing motions for transfer of forum under 28 U.S.C. § 1404(a): "Section 1404(a) provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district .... And ... a proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59–60 (2013) (internal quotation marks omitted).

Typically, when a party moves to transfer venue under Section 1404(a), the moving party has the burden to establish that "a balancing of proper interests weigh[s] in favor of transfer." *United States v. United States Sugar Corp.*, No. CV 21-1644 (MN), 2022 WL 354228 (D. Del. Jan. 11, 2022) (quoting *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970)); *see also Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). When a forum selection clause is at play, however, the burden shifts to the plaintiffs to demonstrate "that transfer to the forum for which the parties bargained is unwarranted." *Atlantic Marine Const. Co.*, 571 U.S. at 51. Furthermore, unlike typical transfer analysis, courts should "not consider the parties' private interests aside from those embodied in the forum-selection clause," thus leaving only public interest considerations. Public interests include "the enforceability of the judgment; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases." *In re: Howmedica Osteonics Corp*, 867 F.3d 390, 402 (3d Cir. 2017). Public interests, however, "rarely defeat a transfer motion." *Atlantic Marine Const. Co.*, 571 U.S. at 51. Given those constraints, "the practical result is that forum-selection clauses should control except in unusual cases." *Id.*

18

Here, the forum selection clause is clear and unambiguous: This case should be decided "in the State of Utah, Cache County," which is part of the Northern Division of the United States District Court for the District of Utah.  It is therefore Plaintiffs' burden to show that this case should be the exception to the foregoing rule.  Moreover, the majority of the public interest factors favor transferring the case to Utah as any potential judgment would be executed in Utah, where iFIT is headquartered, and the District of Utah is slightly less congested than the District of Delaware.  *See* United States District Courts – National Judicial Caseload Profile, https://www.uscourts.gov/sites/default/files/fcms_na_distprofile0630.2022_0.pdf   (last   visited December 21, 2022).  Further, given that the governing law is Utah law, the District of Utah is uniquely familiar with interpreting and applying Utah law.

### C.    Alternatively, this Court Should Dismiss the Class Claims.

If the Court declines to compel arbitration or transfer this case to Utah, then the Court should strike and dismiss Plaintiffs' class claims from the Complaint as Plaintiffs explicitly waived their right to proceed on a class wide basis in the iFIT Terms.  Specifically, Plaintiffs agreed that they would "only resolve disputes with [iFIT] on an individual basis, and may not bring a claim as a plaintiff or a class member in a class, consolidated, or representative action."  [January 2019 iFIT Terms at 9; September 2019 iFIT Terms at 10-11; September 2021 iFIT Terms at 29.]  Quite simply, Plaintiffs agreed that "Class arbitrations, class actions, private attorney general actions, and consolidation with other arbitrations are not allowed under" the iFIT Terms.  [*Id.*]

It is well established that class action waivers are valid and should be enforced.  *See Concepcion*, 563 U.S. at 352 (upholding class action waiver notwithstanding state law rule that such waivers are unconscionable); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 238 n.5 (2013) (FAA "favor[s] the absence of litigation when that is the consequence of a class-action waiver" (internal citations omitted)).  Under Federal Rule of Civil Procedure 23(d)(1)(D), the

Court may "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." *See also* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading … any redundant, immaterial, impertinent, or scandalous matter."). Given that Plaintiffs expressly and repeatedly waived the right to prosecute this dispute on behalf of or as part of a class, the class action aspects of the Complaint should not be allowed to proceed.

Likewise, motions to strike under Rule 23(d)(1)(D) must be granted "when no amount of discovery will demonstrate that the class can be maintained." *Talley v. Gen. Motors, LLC*, No. 1:20-CV-01137-SB, 2021 WL 7209448, at *9 (D. Del. Nov. 26, 2021). That is the case here: No amount of additional discovery will alter the fact that Plaintiffs agreed to waive any right to proceed as a class. *See Wright v. City of Wilmington*, No. 13-1966-SLR-SRF, 2016 WL 356023, at *4 (D. Del. Jan. 28, 2016) (stating that "precertification discovery would be futile in this case because it cannot remove the obstacles to class certification"); *Camilo v. Uber Techs., Inc.*, No. 17-cv-9508, 2018 WL 2464507, at *3 (S.D.N.Y. May 31, 2018) (granting motion to strike class claims based on class action waiver). As a result, if the Court neither compels arbitration nor transfers the action, it should strike the class-related portions of the Complaint.

## V. CONCLUSION

For all of the foregoing reasons, it is respectfully requested that the Court order Plaintiffs to submit their claims to individual arbitration and dismiss this action. Alternatively, if the Court declines to compel arbitration, it is respectfully requested that the Court transfer this case to the United States District Court for the District of Utah. And finally, if the Court declines to do either of those, it is respectfully requested that the Court strike the class claims.

Respectfully submitted,

GIBBONS P.C.

By: /s/ *Christopher Viceconte*
Christopher Viceconte (No. 5568)
300 Delaware Avenue, Suite 1015
Wilmington, DE 19801
(302) 518-6322
cviceconte@gibbonslaw.com

OF COUNSEL:

Terry E. Welch (*pro hac vice*)
Robert S. Clark (*pro hac vice*)
Bryan S. Johansen (*pro hac vice*)
PARR BROWN GEE & LOVELESS LLP
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
(801) 532-7840
twelch@parrbrown.com
rclark@parrbrown.com
bjohansen@parrbrown.com

*Attorneys for Defendant*
*iFIT Health and Fitness Inc.*

Dated:  December 22, 2022